James C. HOWES, Appellant,

v.

NORTH DAKOTA WORKERS
COMPENSATION BUREAU,
Respondent and Appellee,

and

Leingang Steel Siding, Respondent.

Civ. No. 880036.

Supreme Court of North Dakota.

Sept. 20, 1988.

Dietz & Little, Bismarck, for appellant; argued by Stephen D. Little, Bismarck. Appearance by Kathryn L. Dietz, Bismarck.

Hugh P. Seaworth (argued), Asst. Atty. Gen., North Dakota Workers Compensation Bureau, Bismarck, for respondent and appellee.

ERICKSTAD, Chief Justice.

James C. Howes appeals from a district court judgment affirming an order of the North Dakota Workers Compensation Bureau. We affirm.

James Howes was injured on July 10, 1985, when he struck his head on an overhanging steel bar of a horse trailer owned by his employer, Leingang Steel Siding, Inc., of Mandan, North Dakota. Howes was able to finish work after hitting his head, but later became sick and was admitted to the emergency room of a Bismarck, North Dakota, hospital. Howes was hospitalized for five days and was diagnosed as having suffered a craniocerebral trauma.

The Bureau accepted liability in Howes' case, paying medical expenses and disability benefits from July 7, 1985, through July

21, 1985. Howes returned to work on July 22, 1985. However, in March of 1986 Howes was released from his employment. Howes attributed his release to a memory loss which he believed was caused by the accident. The Bureau called Howes' employer who apparently indicated Howes was released because of a "poor work attitude/performance."

Howes testified that he experienced mild headaches several times a week and severe headaches "maybe two times a month" after the July 1985 accident. On March 12, 1986, Howes sought medical treatment from Dr. John S. Pate complaining of what the report denominated a syncopal[1] episode. On March 20, 1986, Dr. Pate again examined Howes to follow up on his complaints. In a medical statement sent to the Job Insurance Claims Office dated that same day, Dr. Pate suggested Howes may be having seizures and advised that it would not be wise for him to work.[2]

1. Syncopal episodes involve fainting and other temporary losses of consciousness due to lack of oxygen to the brain. 3A *Lawyers' Medical Cyclopedia*, § 23.13 (3d ed. 1983).

2. Medical Statement follows:

"Medical Statement
"NAME James C. Howes SSA No. 522–78–8217
"TO THE PHYSICIAN:
"We shall appreciate your certification of the results of your examination, as the examining physician of this individual, in answer to the questions below:
"1. Nature of illness or disability (lay terms) concussion with black-out spells and impaired memory.
"2. Patient under my care from 3/5/86 to present.
"3. Date illness or disability occurred July '85.
"4. Date last examined 3/20/86.
"5. If condition due to pregnancy—
    a. What is the expected date of confinement? No.
    b. What was the date of childbirth? No.
"6. Did you advise patient to quit his/her last job because of illness, disability or pregnancy? No.
"7. Has patient been unable to work at any time due to illness, disability or pregnancy? Yes.
    "If 'Yes,' give dates: From 3/3/86 To present.
"8. Has patient been released as able to resume full-time work? No
    "If 'Yes,' on what date? _____)

On April 26, 1986, Howes experienced a severe headache. Howes was admitted to the hospital and remained there for approximately twenty-one days. Howes sought payment from the Bureau for the medical expenses connected with his second (April 1986) hospitalization.

The Bureau denied liability for the April 1986 hospitalization. The pertinent parts of the Bureau's findings set forth in an "Order Denying Further Benefits" dated October 6, 1986 follow:

"III.

"Claimant alleges he sustained a head injury when he hit his head on a bar as he came out of a horse trailer on July 10, 1985.

"IV.

"Claimant's condition was diagnosed as a craniocerebral trauma.

"9. If patient must now limit the kind, days or hours per week, or place of work because of his/her health, please explain limitation: James Howes may be having seizures at this time and it would not be wise for him to work.

"3/20/86 s/s J. Pate, M.D.
(Date) (Signature of Physician)

515 E. Broadway
(Address)

Bismarck, ND 58501
(City, State, Zip Code)

"CLAIMANT'S RELEASE
"I herewith consent to the release of the above information to the North Dakota Employment Security Bureau with the understanding that it is for the confidential use of that agency in determining my eligibility for unemployment insurance benefits.

_____
Claimant's Signature

"RETURN TO:

"JOB INSURANCE CLAIMS OFFICE
BOX 609
MANDAN, ND 58554
(Local Office Address)"

"V.

"The Bureau accepted liability in this case, paid medical expenses, and paid disability benefits from July 7, 1985, through July 21, 1985.

"VI.

"Claimant returned to work on July 22, 1985.

"VII.

"On March 20, 1986, claimant's physician indicated that the claimant may be having seizures and it would be wise for him not to work.

"VIII.

"A medical report dated March 20, 1986, states that the claimant had a head injury in 1981, with symptoms similar to his current symptoms.

"IX.

"The claimant was hospitalized from April 26, 1986, through May 14, 1986, for severe headaches. He underwent psychological testing and evaluations and it was reported that he had no problems with his memory.

"X.

"Claimant's physician indicated that he believed a great deal of the claimant's headaches were related to tension.

"XI.

"Claimant's medical history indicates that he had been having syncopal episodes prior to an automobile accident in October, 1980. The syncopal episodes went away after the claimant started medication.

"XII.

"The greater weight of the evidence indicates that the claimant's current condition is not in any way related to his employment injury on July 10, 1985.

"CONCLUSIONS OF LAW

\*   \*   \*   \*   \*   \*

"II.

"The claimant has failed to prove that he is entitled to further benefits under the North Dakota Workmen's Compensation Act over and above those previously awarded and paid."

Howes requested and was granted a rehearing before the Bureau. After the Bureau heard testimony from Howes, it affirmed its decision denying further benefits:

"The greater weight of the evidence, including testimony adduced at the formal hearing and medical reports in connection with claimant's medical assessment, indicated that the claimant's continued complaints and hospitalization are not the result of the July 10, 1985, incident in the horse trailer."

Howes appealed the Bureau's decision to the district court, which affirmed the Bureau's decision. On appeal to the district court and this Court Howes raises the following three issues:

"I.  THE BUREAU HAD A RESPONSIBILITY TO DEVELOP THE EVIDENCE FURTHER IN THIS CLAIM FOR MEDICAL BENEFITS IN ORDER TO ASCERTAIN THE SUBSTANTIAL RIGHTS OF THE PARTIES.

"II.  THE BUREAU FAILED TO CLARIFY INCONSISTENT MEDICAL EVIDENCE.

"III.  THE BUREAU'S PROCEDURES DEPRIVED HOWES OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS."

I.

■ The essence of Howes' first contention is that the Bureau has the evidentiary burden of proving that Howes' 1986 headaches and hospitalization are unrelated to his July 1985 head injury, rather than Howes having the burden of proving that his July 1985 head injury *is* related to his

April 1986 headaches and hospitalization. Howes contends "[t]here is simply no authority for the Bureau's position" that Howes has the burden of proof with respect to connecting the July 1985 head injury to his April 1986 headaches. We disagree.

Section 65–01–11, N.D.C.C., unequivocally states that the claimant "shall have the burden of proving by a preponderance of the evidence that he is entitled to participate" in the fund. Our decisions have consistently recognized that the claimant must show that an "ensuing disability is causally connected to the employment injury." *Inglis v. North Dakota Workmen's Compensation Bureau*, 312 N.W.2d 318, 322 (N.D.1981); *Claim of Bromley*, 304 N.W.2d 412, 415 (N.D.1981), *citing Kuntz v. North Dakota Workmen's Compensation Bureau*, 139 N.W.2d 525 (N.D.1966).

Following Howes' July 1985 head injury, the Bureau accepted liability for medical expenses and disability benefits. Howes returned to work in July of 1985 and did not contact the Bureau for further benefits until after his headaches and hospitalization in April of 1986. Howes insists that he "proved" his case in July of 1985 and wonders "[h]ow many times must he prove his case?" We addressed the subject of Howes' question recently in *Hayes v. North Dakota Workers Compensation Bureau*, 425 N.W.2d 356, 357 (N.D.1988): "If the Bureau terminates benefits, after initially accepting a claim and paying benefits, the claimant has the burden of proving his or her right to continue receiving benefits." *See also Gramling v. North Dakota Workmen's Compensation Bureau*, 303 N.W.2d 323, 325–26 (N.D.1981).

## II

■ Howes next contends the Bureau failed to clarify inconsistent medical evidence, and "chose to ignore" Howes' testimony which tended to prove that the April 1986 headache and hospitalization were causally connected to the July 1985 head injury. Howes further contends the Bureau "chose to ignore" a March 1986 statement of Dr. Pate which indicated Howes was experiencing a concussion with blackout spells and impaired memory.[3]

Our decisions have recognized that the adversarial concept has only limited application in determinations related to workers compensation claims. We have recently said that the Bureau is "obligated to consider the entire medical record, and if there is conflicting medical evidence, some favorable and some unfavorable to the claimant, the Bureau must adequately explain its reason for disregarding the favorable evidence in denying benefits." *Hayes, supra* at 357; *see also Weber v. North Dakota Workmen's Compensation Bureau*, 377 N.W.2d 571, 574 (N.D.1985) (Bureau did not "adequately address" medical evidence which did not support its findings).

Initially our rule requiring the Bureau to make reasonable efforts to clarify discrepancies in medical evidence arose out of a situation wherein the attending physician's report contained the discrepancy. *See Claim of Bromley, supra* at 417.[4] In a case following *Bromley* involving the issue of discrepancies in the medical evidence, the discrepancies were contained within different reports from the same doctor. *See Roberts v. North Dakota Workmen's Compensation Bureau*, 326 N.W.2d 702, 706 (N.D.1982). In *Roberts*, the examining physician made two different statements in two different documents about the cause of the claimant's disability. A statement in the first report partially conflicted with a statement in the latter report.

---

3. *See supra* note 2 for text of the medical statement.

4. In *Bromley* we stated:
   "In this instance the Bureau based its decision upon the part of the report by Dr. Ching supporting its decision but discounted the part of the same report which was inconsistent with its decision without any attempt to obtain a clarification of the discrepancy. This report, as well as the other reports made by Dr. Ching, were received by the Bureau before it made its initial dismissal order. The Bureau could not help notice these discrepancies and should have made reasonable efforts to have them clarified." *Bromley*, 304 N.W.2d at 417.

*Roberts* thus slightly expanded the principle in *Bromley* to require the Bureau to clarify conflicting evidence from the same individual who provided conflicting evidence in two different written reports. We concluded it is "inappropriate for the Bureau to rely only upon that part of an inconsistent medical report which is favorable to the Bureau's position without attempting to clarify the inconsistency." *Roberts, supra* at 706.

More recently in *Weber, supra* at 574, the Bureau was presented with conflicting evidence between two different orthopedic surgeons about the amount of time it would take the claimant to recover from his work related injury. Relying on *Bromley,* we remanded the case in *Weber* to "clarify the discrepancies." *Weber, supra* at 574.

*Bromley* has apparently been expanded to require the Bureau to attempt to clarify conflicting medical evidence from different physicians. Notwithstanding this expansion we must keep in mind the basic rule which was stated in *Bromley* by Justice Sand who first enunciated our medical evidence discrepancy rule:

"Normally, it is within the province of the administrative agency, not the courts, to weigh conflicting medical opinions and to resolve these conflicts. *Hassler v. Weinberger,* 502 F.2d 172 (7th Cir.1974)." *Bromley, supra* at 417.

We must also keep in mind that pursuant to section 28–32–19, N.D.C.C., we must affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence or its conclusions are not supported by its findings of fact. *Hayes, supra* at 356–57, *citing Gramling, supra.* In determining whether or not an agency's findings of fact are supported by a preponderance of the evidence we do not make independent findings of fact or substitute our judgment for that of the agency, but we determine only whether a reasoning mind could have reasonably determined that the factual conclusions were supported by the weight of the evidence. *Power Fuels, Inc. v. Elkin,* 283 N.W.2d

214 (N.D.1979). We believe the Bureau's conclusions are supported by a preponderance of the evidence and that the Bureau has adequately addressed conflicting evidence.

Howes was examined by Dr. Pate prior to the April 1986 hospitalization. Pate's assessment, noted in the medical records from that period, indicates a possible concussion disorder.[5] Pate recommended treating Howes' blackout episodes with medication or otherwise seeing Donald M. Larson, M.D., a neurologist, for additional evaluation of the problem. Dr. Larson was consulted during the April 1986 hospitalization.

Howes again saw Dr. Larson when he underwent a "complete medical assessment" which included "psychological, psychiatric, neurologic, physical therapy, occupational therapy, social service and orthopedic evaluations" during March 1987. Howes also had an ophthalmological evaluation in March of 1987.

Howes' neurologic exam was "normal" and the examining physician, Dr. Larson, concluded that Howes' "problems with tension and nervousness ... [have] a considerable bearing on his headaches." D.E. Townes, M.D., found "no ocular explanation for headache and no evidence for any residium from prior traumatic episode."

Dr. Greg S. Peterson, M.D., also examined Howes and concluded:

"Mr. Howes has had a long history of nonspecific 'spells' of unknown etiology. His headaches do not appear to be related to his 7–10–85 work related head trauma. There is no evidence of memory loss and the patient's reports of retrograde memory loss are not at all characteristic of patients with head trauma. The headaches that prompted admission to the hospital in April of 1986 would not *appear to have any direct relationship to his work related injury.* There was no evidence of disability on our evaluation."

Weighing this evidence along with evidence of Howes' prior medical history

---

**5.** The Job Insurance claim form filed by Dr. Pate refers back to July 1985 as the date the disability occurred. *See supra* note 2 for the full text of this medical statement.

against Howes' testimony that his April 1986 headache and hospitalization were related to the July 1985 head injury, we believe a reasoning mind could have reasonably concluded that Howes failed to show a causal connection between his July 1985 head injury and his April 1986 headaches.

### III

Howes' final contention is that the Bureau's formal hearing process deprives him of due process guaranteed by the state and federal constitutions.

Howes wrote the Bureau asking "[i]f the Bureau intends to rely upon evidence not presented at the pending formal hearing, please provide me with a copy of such evidence and please consider this a request to cross-examine the person[s] furnishing such evidence, pursuant to Section 28–32–07, N.D.C.C." While the Bureau responded that it would "rely on the entire record," Howes apparently anticipated that the Bureau would base its determination, at least in part, on medical reports written by Dr. Larson, and asked the Bureau to depose him. Counsel for the Bureau wrote a letter to Larson and asked whether or not his medical opinion could be determined by answering some written questions relating to Howes' case. By letter the Bureau submitted questions to Larson and Larson responded in a written report. The Bureau apparently made Larson's answers available to Howes pursuant to section 28–32–07, N.D.C.C., which reads in relevant part:

"*28–32–07. Consideration of information not presented at a formal hearing.*—If an administrative agency desires to avail itself of competent and relevant information or evidence in its possession or furnished by members of its staff, or secured from any person in the course of an independent investigation conducted by such agency, in addition to the evidence presented at any formal hearing, it may do so after first transmitting a copy of such information or evidence or an abstract thereof to each party of record in the proceeding, and after affording each such party, upon written request, an opportunity to examine such informa-

tion or evidence and to present evidence in connection therewith and to cross-examine the person furnishing such information at a further public hearing to be called and held upon at least ten days' notice given by registered or certified mail. Nothing contained in this section prevents any administrative agency from taking notice of any fact or facts set forth in its duly adopted rules or any facts which are judicially noticed by the courts of this state."

█ Howes contends that as the Bureau used this medical evidence, the Bureau should have afforded Howes the opportunity to cross-examine Dr. Larson either by deposition or at the formal hearing and that the cost of the cross-examination should have been borne by the Bureau. After submitting the questions to Dr. Larson, however, counsel for the Bureau notified Howes that in the past Larson had been reluctant to participate in depositions and doubted he would be more willing to help here. Dr. Larson suggested by letter to the Bureau's counsel that an evaluation by another MedCenter One physician might be the best way to obtain a comprehensive view of Howes' problem. In response to this suggestion, and in light of Dr. Larson's past reluctance to being deposed, the Bureau arranged for the more complete medical assessment which was later accomplished and is earlier referred to herein.

We believe section 28–32–07, N.D.C.C., clearly grants Howes, upon written request, the right to cross-examine the physician at a "further public hearing." However, section 28–32–07, N.D.C.C., does not require the Bureau to pay for the costs of the cross-examination. Who must bear those costs is addressed in section 28–32–09, N.D.C.C., which reads in relevant part:

"*28–32–09. Subpoena and attendance of witnesses....* The deposition of a witness or party in any proceeding before an agency may be taken in the same manner and on the same notice as in a civil action pending in the district court. Interrogatories may be sent to any witness or party in any proceeding in the same manner and on the same notice

as in an action pending in the district court. A party, other than the administrative agency, must first show good cause before undertaking discovery proceedings, including interrogatories. Any witness who is subpoenaed under the provisions of this section and who appears at the hearing, or whose deposition is taken, shall receive the same fees and mileage as a witness in a civil case in the district court, *and such fees shall be paid by the party or agency at whose instance the witness appears or his deposition is taken*". [Emphasis added.]

It is within the Bureau's discretion to approve the taking of depositions to be paid for by the Bureau, and each case must be judged on its merits. *Hayes, supra* at 358; *Steele v. North Dakota Workmen's Compensation Bureau*, 273 N.W.2d 692, 702 (N.D.1978). In this case the Bureau concluded that the physician's opinion could be obtained "informally" by a written report.

The general rule in workers compensation law is that each party pays his or her own attorney and costs unless a statute specifically provides otherwise. *Gross v. Great A. & P. Tea Co.*, 87 Mich.App. 448, 274 N.W.2d 817, 818 (1979); 3 Larson's Workmen's Compensation Law § 83.20, p. 15–695. Section 65–02–08, N.D.C.C., provides that the Bureau shall pay a claimant's attorney fees incurred "in proceedings before the bureau...." *Moore v. North Dakota Workmen's Comp. Bureau*, 374 N.W.2d 71, 74 (N.D.1985). Section 65–10–03, N.D.C.C., provides in pertinent part:

"The cost of the appeal and an attorney's fee for the appellant's attorney shall be set by the appellate court and taxed against the bureau unless the appeal is determined to be frivolous. The bureau shall pay such attorney's fee from the bureau general fund. The amount of such attorney's fee shall be determined in the same manner as prescribed by the bureau for attorney fees, and the amount of attorney's fee already allowed in proceedings before the bureau shall be taken into consideration."

The North Dakota Legislature, therefore, specifically requires the Bureau to pay the claimant's attorney's fees and costs on appeal. The costs of taking depositions and subpoenaing expert witnesses for cross-examination, being not a part of the "appeal" process, are not set by the appellate court but are governed by section 28–23–09, N.D. C.C.

Statutes in other jurisdictions have been construed to require the Bureau to pay the claimant's attorney's fees as well as expert witness fees. *See Moore v. General Motors Corp., Terex Div.*, 18 Ohio St.3d 259, 480 N.E.2d 1101 (1985) (relying on statute to allow recovery of fees for expert preparing for and giving deposition); *Schauder v. Brager*, 303 Md. 140, 492 A.2d 630 (1985) (Workers Compensation Commission has power under statute to approve and modify experts' fees); *Cf. Rosenbaum v. Industrial Commission*, 93 Ill.2d 381, 67 Ill.Dec. 83, 444 N.E.2d 122 (1983) (statute indicates that the Commission has discretion in deposing experts, and where claimant refused to subpoena because of cost, not an abuse of discretion to refuse to issue dedimus potestatem to secure testimony of claimant's treating physicians).

Section 1–02–02, N.D.C.C., states that "[w]ords used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears...." We understand the phrase "attorney's fee" as used in sections 65–02–08 and 65–10–03, N.D.C.C., to mean expenses incurred for the services of an attorney. Section 28–32–09, N.D.C.C., places the expense of witness fees on the party who calls the witness. Therefore, we conclude the Bureau did not abuse its discretion in refusing to pay the cost of deposing Dr. Larson.

■ Further, we are not convinced the Bureau's "practice" of securing medical statements such as Dr. Larson's opinion deprived Howes of due process under the federal and state constitutions. We discussed the parameters of due process in the context of an administrative proceeding in *First American Bank & Trust Company v. Ellwein*, 221 N.W.2d 509, 514 (N.D. 1974), *cert. denied*, 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301, *reh'g denied*, 419 U.S. 1117, 95 S.Ct. 798, 42 L.Ed.2d 816 (1975):

"What constitutes due process within an administrative proceeding? While recognizing that the adjudicative function of the Board is quasi-judicial in nature, we have never held that the minimal due process that must be afforded participants before an administrative board or agency is synonymous with minimal requirements of due process in a court of law. To do so would be to create a second judicial branch without statutory authority and add to time required in the disposition of administrative decisions." 221 N.W.2d at 514.

More recently in *Berger v. State Highway Commissioner*, 394 N.W.2d 678, 681 (N.D.1986), we said that a person before an administrative agency cannot demand due process equivalent to that followed in courts, but that a person is entitled to procedural fairness in an administrative hearing.[6]

The fundamental requirements of due process are notice of contemplated action and the opportunity to be heard.[7] *Beckler v. North Dakota Workers Compensation Bureau*, 418 N.W.2d 770, 773 (N.D.1988) *citing Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (continuing right to welfare benefits is an entitlement equivalent to a property interest within meaning of Due Process Clause of Fourteenth Amendment of the United States Constitution). A fair hearing includes the opportunity to confront and cross-examine adverse witnesses.[8] Which party bears the

---

**6.** The decisions of the federal courts indicate that a full judicial hearing in conjunction with administrative proceedings has been required only if the interest at stake is protected by due process and if adjudicative facts are in dispute. 2 Davis, Administrative Law Treatise § 12.10 (2d ed. 1979).

**7.** In an article written by the late Judge Henry J. Friendly as recently as 1975, Mr. Justice White was quoted as stating, "The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests." *See Some Kind of Hearing*, 123 U Pa.L.Rev. 1267 (1975) (hereinafter *Hearing*) (quoting from *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–2976, 41 L.Ed.2d 935 (1974)).

Judge Friendly, in discussing further due process requirements and the right of participants before an administrative board or agency to cross-examine witnesses, said that the Administrative Procedure Act (APA) enacted in 1946, prescribed trial-type procedures only "when rules are required by statute to be made on the record after opportunity for an agency hearing." 5 U.S.C. § 553(c) (1970). He continued:

"When the question of the scope of this exception finally reached the Supreme Court in *United States v. Allegheny–Ludlum Steel Corp.* [406 U.S. 742, 757 [92 S.Ct. 1941, 1950, 32 L.Ed.2d 453] (1972)] and *United States v. Florida East Coast Railway Co.* [410 U.S. 224, 239 [93 S.Ct. 810, 818, 35 L.Ed.2d 223] (1973)], not only was the exception given a narrow construction but the opinions (particularly the one in *Florida East Coast*) opened wide and unexpected vistas for the use of less than full trial-type hearing procedures in business and social regulation." *Hearing, supra* at 1272–73.

**8.** In pointing out that the right of confrontation is the most debated issue in conjunction with

executive and administrative proceedings, Judge Friendly noted:

"Since the only provision in the Bill of Rights conferring the right of confrontation is limited to criminal cases, one might think the constitutional right of cross-examination was similarly confined. However, in *Greene v. McElroy* [360 U.S. 474, 497 [79 S.Ct. 1400, 1413–1414, 3 L.Ed.2d 1377] (1959) ] Chief Justice Warren said that the Court had applied this principle 'in all types of cases where administrative and regulatory actions were under scrutiny.'" *Hearing, supra* note 7, at 1283.

In *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287, 299 (1970), the Supreme Court addressed the constitutional issue with respect to executive and administrative proceedings and held that due process requires timely and adequate notice and an effective opportunity to defend by confronting any adverse witnesses and by presenting arguments and evidence orally.

However, Judge Friendly noted that:

"The absolutes of *Greene v. McElroy* [360 U.S. 474, 496–97 [79 S.Ct. 1400, 1413–1414, 3 L.Ed.2d 1377] (1959) ] and of *Goldberg v. Kelly* [397 U.S. 254, 269–70 [90 S.Ct. 1011, 1020–1022, 25 L.Ed.2d 287] (1970) ] with respect to confrontation arguably have now been ended by *Wolff v. McDonnell* [418 U.S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974) ]. There the Court considered whether a prisoner faced with the loss of up to eighteen months in 'good time' credits had a constitutional right to confront and cross-examine adverse witnesses. It concluded that, in the special circumstances of the prison, interest-balancing would dictate a right to cross-examination only in a most limited range of cases. In other situations, whether to allow cross-examination was left to the 'sound discretion' of the prison authorities." [Citations omitted.] *Hearing, supra* at 1285–86.

expense associated with the right of confrontation requires a balancing of the interests involved.[9] Such a determination is best made by the Legislature.[10]

Howes requested and the Bureau granted a full evidentiary hearing to determine the correctness of its decision to terminate Howes' benefits. Howes was given an opportunity to be heard. Howes also had the opportunity to cross-examine Dr. Larson, albeit at Howes' expense, through the use of a deposition or subpoena to appear at a formal hearing. Section 28–32–09, N.D.C. C. Accordingly, we conclude that neither Howes' state nor federal constitutional due process rights were violated.

For the reasons stated herein, the judgment affirming the Bureau's decision is affirmed.[11]

GIERKE and VANDE WALLE, JJ., concur.

MESCHKE, Justice, dissenting.

I respectfully dissent. Howes was effectively denied opportunity to cross-examine adverse medical experts and did not receive a fair hearing.

James Howes worked in the warehouse for Leingang Steel Siding in Mandan. On July 10, 1985, shortly before 5:00 P.M., he was loading windows into a horse trailer. As he hurried out of the trailer, he struck his head on a bar across the back of the trailer. Dr. Larson, who saw him the next day, described his injury:

"He was not rendered unconscious but he did see stars and apparently took a fairly good blow to the head. He then started having headaches which became progressively worse. He started vomiting about 10 p.m. and then came into the emergency room and was admitted. He had noted some blurred vision last night. He noted increased headache pain by coughing or sneezing."

Dr. Larson diagnosed "craniocerebral trauma." Howes was released from the hospital on July 15 and returned to work on July 22. The Workers Compensation Bureau paid his medical bills and paid him disability benefits for July 11 through July 21, 1985.

Leingang discharged Howes from employment on March 3, 1986. Leingang later reported to the Bureau that he was "released for poor work attitude/performance. Would not keep at his work. Work performance was not significantly different from pre-injury performance vs post-injury."

Howes went to Dr. Pate of the Family Practice Center on March 12, 1986. Dr. Pate reported to the Bureau on March 20, 1986:

Judge Friendly further noted that "the *Wolff* decision, as well as the case-by-case approach of *Gagnon v. Scarpelli* [411 U.S. 778, 787–91 [93 S.Ct. 1756, 1762–1764, 36 L.Ed.2d 656] (1973)] on revocation of probation, are likely to have considerable anti-*Goldberg* reverberations." *See Hearing, supra* note 7, at 1288–89.

9. Judge Friendly suggests:
    "It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the deserving." *Hearing, supra* note 7, at 1276.

10. Courts are good at deciding cases, bad at drafting legislation; typically they see the case at hand and a few others but not the entire spectrum. *Hearing, supra* note 7, at 1302.

11. In light of the length, content, tenor and intensity of the dissent some response seems appropriate if not required.

The essence of the dissent seems to be that as the Bureau relies upon Dr. Larson's report and responses to written questions posed by the Bureau, Howes is entitled to cross-examine Dr. Larson at the Bureau's expense to test the truth of his testimony. Actually, however, Howes has the burden of proving he is entitled to benefits pursuant to § 65–01–11, N.D.C.C. See discussion in opinion. Dr. Larson was Howes' own doctor and was not sought out by the Bureau as its own expert to meet Howes' expert testimony.

Incidentally, if we were to require the Bureau to pay for subpoena costs, not only might this further deplete scarce and diminishing funds, but it would also likely introduce a delaying factor into an increasingly complex process and produce or increase a backlog in Workers Compensation cases. These latter consequences point to a need for legislative attention rather than for judicial legislation.

"Concussion with blackout spells and impaired memory.

" * * *

"July, 1985

" * * *

"James Howes may be having seizures at this time and it would not be wise for him to work."

On April 26, 1986, Howes was hospitalized for headaches and dizziness with vomiting on April 25. Family Practice Center physicians again referred him to Dr. Larson. Upon his release from the hospital on May 14, 1986, Dr. Larson equivocated in his report to the Bureau:

"After admission, he was followed by the FPC physicians and I was asked to see him in consultation. Felt there may be some vascular component initially and he was placed on Inderal therapy but no changes in his headaches at all. He did have a number of psychological tests and evaluations done and they found no problems with his memory. Overally, [sic] his headaches persisted. He was tried on a great number of therapies including Inderal, biofeedback, steroids, and lastly some Sansert. There was improvement in headache toward the end, but still had some problems. Felt that a great deal of the headaches are related to tension. Although some of the headaches have some vascular components to them. He was discharged on Sansert 2 mg b.i.d., Elavil 25 mg t.i.d. and some Tylenol # 3 to be used every 6 hours PRN for severe headaches. He will be followed in the clinic again in 4 weeks."

On October 6, 1986, the Bureau denied Howe's claim for the March–May 1986 medical expenses. Picking out references in his medical records to a childhood fall at the age of 6 and to his "having syncopal episodes prior to an automobile accident in October, 1980," the Bureau concluded that "the greater weight of the evidence indicates that the claimant's current condition is not in any way related to his employment injury on July 10, 1985."

Howes requested a hearing and sought a deposition of Dr. Larson. Instead, the Bureau wrote Dr. Larson with questions:

"Given Mr. Howes' medical history, complaints and examination results, do you have an opinion as to whether the headaches he presently complains of are 'more likely that [sic] not', or 'probably' caused by the July 10, 1985 horse trailer incident (hit top of head on crossbar)? If so, what is your opinion?

"Is it just as likely that Mr. Howes' headache complaints are related to some other factor such as some other trauma? seizure disorder? muscle spasm? or even smoking allergy? Please explain if you can. Is there anything else you can add that might help?"

The Bureau also advised Howe's counsel:

"Dr. Larson has, in the past, expressed reluctance to participate in a deposition. I hope he is more willing to help here, but I doubt it."

A few days later, without responding to the questions, Dr. Larson suggested:

"... an evaluation by Doctor Saxvik at Medcenter One may be the best way to obtain a comprehensive view of Mr. Howes' problem."

In late March 1987, the Bureau arranged for Howes to enter Medcenter One as an inpatient for four days of "complete medical assessment," including "psychological, psychiatric, neurologic, physical therapy, occupational therapy, social service, and orthopedic evaluations as necessary." Medcenter One reported to the Bureau on April 8, 1987.

Social Worker Scott D. Boehm concluded that "[t]here does not appear to be any glaring significant psychosocial problem which is interferring with his rehabilitation process." Jeff Lange, Rehabilitation Physical Therapist, concluded that "[d]ue to the fact that this patient states that his headache is generally around a 1–2, and that his severe headaches come only 1–2 times a month, I do not feel that this would significantly interfere with any employment." Dick Elefson, MAC, had no specific recommendations and "deferred" his diagnostic impression. Dr. Townes reported a "normal eye examination. I can find no ocular explanation for headache and no evidence

for any residium from prior traumatic episode." Dr. Lampman's assessment was:

"Mild continuous frontal vertical headaches with occasional exacerbations, probably not limiting his occupation. This man did have a report of trauma to the head, but never had a concussion. Therefore this cannot be classified as a postconcussive syndrome. All we have to go on is his description of headache and his occasional requirement for Tylenol with Codeine to relieve flares. As I see it, not much more can be said at this point from a clinical standpoint."

Dr. Larson was again consulted and once more hedged in his report to the assessment team:

"This is a gentleman that presents with some episodes of spells dating back to age 14. Was on Phenobarbitol therapy for a period of time, however, all the EEGs have been normal. He has had several blows to the head, one in an auto accident in October of 1980 and then in 1985 struck his head on a bar across a horse trailer, but not rendered unconscious in that. He continues to complain of headaches and is unresponsive to most forms of therapy.

"Psychological testing in the past have shown some problems with tension and nervousness and feel that this has a considerable bearing on his headaches. I could find no other specific organic reason for the headaches. CT scan of the head and brain done here last few days again is normal. His usage of medicine at the present time is down to practical nothing, taking he indicates about five Tylenol per month. With some of the more severe headaches, may use a few occasional Tylenol # 3, but again the headaches do not seem to be troublesome in that he had been able to work and hold a job then."

Dr. Greg S. Peterson, Medical Director for Medcenter One Rehabilitation, summarized:

"Mr. Howes has had a long history of nonspecific 'spells' of unknown etiology. His headaches do not appear to be related to his 7–10–85 work related head trauma. There is no evidence of memory loss and the patient's reports of retrograde memory loss are not at all characteristic of patients with head trauma. The headaches that prompted admission to the hospital in April of 1986 would not appear to have any direct relationship to his work related injury. There was no evidence of disability on our evaluation."

Dr. Peterson concluded:

"(1) Release to work without restrictions.

"(2) Workmen's Compensation does not appear to be responsible for payment for the hospitalization in April of 1986 for evaluation of headaches.

"(3) It does not appear that Workmen's Compensation should be responsible for any future medical bills for headaches unless a new work related head injury occurs."

The Bureau scheduled a "formal hearing." The notice to Howes did not mention cross-examination but directed: "You will present at the hearing all witnesses and evidence known to you" on the issue of "whether the claimant is entitled to any further benefits ... in connection with an alleged injury sustained on July 10, 1985." Strikingly, the notice of the hearing to the employer, the claimant's true adversary, emphasized the right to cross-examine:

"The hearing itself, will consist of presentation of the claimant's own case first, followed by an opportunity for the employer to *cross examine*. The Bureau, through its legal counsel, will also have a chance to *cross examine* the witnesses. *The direct and cross examination will continue until each party has presented all of its case.* Although not required, you may want to retain legal counsel to represent you, especially since the claimant will almost always be represented by the claimant's attorney." (My emphasis).

Counsel for Howes promptly wrote the Bureau:

"[I]f the Bureau intends to rely upon evidence not presented at the pending formal hearing, please provide me with a copy of such evidence and please consid-

er this to be a request to cross-examine the person(s) furnishing such evidence pursuant to Section 28–32–07, N.D.C.C."

Counsel for the Bureau responded:

"Enclosed is an updated copy of the file. The Bureau will rely upon the entire file in addition to evidence adduced at the hearing.

"If you are requesting that persons be subpoenaed, let me know which persons."

At the outset of the hearing on August 5, 1987, counsel for Howes stated:

"If the Bureau intends to rely on medical evidence in the file, to which I have not been allowed an opportunity to examine the expert witnesses, I would request that opportunity prior to a decision."

The Bureau's counsel responded:

"It's my understanding that this case is going to follow the same policy that the Bureau has used in considering the entire record, which includes medical records from various examining doctors, and the like. I believe that [counsel for claimant] has been given access to the entire file.... The Bureau generally has no objection to subpoenaing witnesses, but often denies the payment in connection with cross-examination. And I think that, if anything, that's what's being done here."

Counsel for Howes reiterated:

"I ... maintain that if the Bureau uses evidence, it's the Bureau's responsibility to make that—not simply the summary of evidence but the source of the evidence available to the claimant for examination at the Bureau's expense, as opposed to the claimant bringing in his own witnesses at the Bureau's expense."

Only Howes testified at the hearing. Howes identified his headaches as following his July 10, 1985 injury and disclaimed any prior continuing symptoms from a childhood fall from a garage at age 6 or from an auto accident at age 15.

On September 14, 1987 the Bureau adhered to its order denying further benefits. The Bureau found:

"IX.

"... During the rehearing process, the Bureau undertook further investigation and review of additional evidence submitted on behalf of Mr. Howes. The Bureau's further investigation included medical assessment by a team of medical experts at Medcenter One.

"X.

"The greater weight of the evidence, including testimony adduced at the formal hearing and medical reports in connection with claimant's medical assessment, indicated that the claimant's continued complaints and hospitalization are not the result of the July 10, 1985, incident in the horse trailer."

Howes appealed. He expressed his issues on appeal in terms of the Bureau's duty to develop and clarify medical evidence and in terms of due process, claiming that the "Bureau's consideration of and reliance upon evidence to which Howes was not afforded the right of cross-examination clearly violated ... due process."

I agree that Howes was effectively denied opportunity to cross-examine adverse medical experts and, therefore, did not have a fair hearing. NDCC 28–32–19(4).

We have no occasion in this case to contemplate the constitutionally dictated scope of a fair hearing. We need only apply the Administrative Agencies Practice Act, NDCC Ch. 28–32, in a uniform manner, consistent for all agencies, and specifically correlated with the mandates of the Workers Compensation Act. The Bureau's procedures are "governed by the provisions of chapter 28–32" and the Bureau must "ascertain the substantial rights of all the parties." NDCC 65–02–11.

The Bureau seeks the power to short-cut evidentiary rules. And, for its actions apart from required trial-type hearings, we have properly recognized that the Bureau may reasonably consider its records without "an occasion to confront witnesses." *See*, for example, *Beckler v. North Dakota Workers Compensation Bureau*, 418 N.W.2d 770, 775 (N.D.1988). But, at a

trial-type hearing, the Administrative Agencies Practice Act, fairly applied, requires that a claimant be "afforded the same opportunity to present evidence and to examine and cross-examine witnesses as is permitted under section 28–32–06." NDCC 28–32–05(5).

NDCC 28–32–06 makes the practice in district court govern the admissibility of evidence "insofar as circumstances will permit." Thus, a trial-type hearing is mandated by the statute before an employee-claimant can be denied benefits when there are genuinely disputed and material facts. While the Bureau may waive the usual rules of evidence if "*necessary* to ascertain the substantial rights of all the parties," it can use "only evidence of probative value." NDCC 28–32–06. (My emphasis). Only evidence "offered and made a part of the official record of the hearing" can be considered, "except as otherwise provided in this chapter." *Id.* No exception is made for hearsay reports of experts without opportunity for cross-examination to test their opinions.

If the Bureau considers anything "in addition to the evidence presented at any formal hearing," it must do more than just give a copy to the claimant. NDCC 28–32–07. The Bureau must "*afford*" the claimant an opportunity "to cross-examine the person furnishing such information at a . . . public hearing . . . upon at least ten days' notice." *Id.* "Afford" means, principally, "to manage to pay for or incur the cost of; . . . GIVE, FURNISH." Webster's Third New International Dictionary (1971).

Even without problems of procedural unfairness, Howe's claim appears to me to be evidentially close and difficult to weigh. Howes is not entitled to compensation benefits if his headaches in the spring of 1986 came from tensions of his loss of employment. *Choukalos v. North Dakota Workers Compensation Bureau*, 427 N.W.2d 344 (1988). At the other extremity of consideration, he is not entitled to benefits if his headaches came from a distant childhood incident or from symptoms existing before July 1985. But, if the more recent and apparently more severe "craniocerebral trauma" of July 10, 1985 was a substantial contributing factor to his following headaches, Howes is entitled to benefits. Ordinarily, the proximity and the seriousness of his 1985 work injury would weigh heavily in Howes' favor. The medical team's assessments did not explain why they attributed Howes' headaches after July 1985 to earlier incidents rather than the more recent and more serious trauma. It is plain that a trial-type hearing was essential to sift and weigh the facts and opinions about this claim before it could be fairly denied.

Only the "weight" of paper reports supports the Bureau's decision to attribute Howes headaches to remote incidents, in spite of Howes' testimony disputing the seriousness of those events and disclaiming any continuing effects from them. The Bureau's findings, after the formal hearing, rest entirely on the team's written assessments, and particularly Dr. Peterson's sweeping conclusions for the team.[1] Thus, those uncritiqued and unexplained medical reports are the crucial evidence on this claim.

Full disclosure of the facts is fundamental to fact finding. Cross-examination is essential to full disclosure. Model State Administrative Procedure Act § 10(3); 2 Am.Jur.2d *Administrative Law* § 424 (1962). This court has often emphasized the crucial importance of cross-examination in a trial-type hearing when an agency sought to deny it. *Colgate–Palmolive Company v. Dorgan*, 225 N.W.2d 278, 281 (N.D.1974). *See also Insurance Services Office v. Knutson*, 283 N.W.2d 395, 399 (N.D.1979).

---

1. The majority opinion cheerfully recharacterizes "Dr. Larson [as] Howes' own doctor . . . not sought out by the Bureau as its own expert. . . ." It is true that Dr. Larson was Howes' treating physician in July, 1985, but it cannot be fairly concluded that "once the claimant's doctor, always the claimant's doctor." Dr. Larson was consulted and paid by the Bureau for the team assessment. His vague report contained no conclusion negating Howes' claim; Dr. Peterson came up with the harsh conclusions for the team.

3 Larson's Workmen's Compensation Law § 79.83(a) expresses this importance eloquently:

> "Fair play rules include the right of cross-examination, rules against ex parte statements, necessity of having all evidence on the record, and restrictions on determinations made by independent investigation conducted by the tribunal. These rules are based on fundamental notions of fairness. Nothing is more repugnant to Anglo–American traditions of justice than to be at the mercy of witnesses one cannot see or challenge, or to have one's rights stand or fall on the basis of unrevealed facts that perhaps could be explained or refuted." (Footnotes omitted).

Justice Frankfurter, in his renowned concurring opinion in *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) put the principle succinctly: "[A] democratic government must ... practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."

The Bureau's position was that Howes had opportunity to cross-examine. The Bureau offered to subpoena any of the physicians but only at Howes expense. The Bureau rationalized this severe course by disclaiming any need for its own or adverse witnesses' testimony at a formal, trial-type hearing. Instead, the Bureau urged that a claimant must obtain the testimony of any medical witness, even those adverse to him, at his own expense. The Bureau relied on NDCC 28–32–09 which says, "Any witness who is subpoenaed" under the Administrative Agencies Practice Act must "be paid by the party or agency at whose instance the witness appears or his deposition is taken."

An expert whose written opinion is adverse does not "appear" at the "instance" of a claimant. An expert's opinion is excludable hearsay and cannot fairly stand alone at a trial-type hearing unless the expert is available and "appears" at the hearing for cross-examination. NDREv 801(c). "[T]he hearsay rule is not a mere technical rule but is a basic rule of exclusion to protect the right of cross-examination." 4 Jones on Evidence § 30:7, p. 343 (1972).[2] "[W]hen a statement is offered to prove the truth of the matter asserted ... there is a lack of the safeguards used to insure credibility of the declarant. It is this lack of an oath and cross-examination of the declarant that warrants the exclusion of evidence as hearsay." Explanatory Note, NDREv 801, North Dakota Court Rules p. 467 (West Publishing Company; 1988).[3]

Expert opinions are not excepted from the hearsay rule. NDREv 802 and 803. Medical experts are not excepted from cross-examination to test the footings of their opinions. NDREv 705. Cross-exam is the predicate for admission of a written report of an expert in a trial-type hearing.

Thus, the rules of evidence, applicable to administrative actions by NDCC 28–32–06, contradict the notion that a claimant must bear the expense of the "appearance" of an adverse witness for cross-examination. The opportunity to test an opposing witness cannot be fairly and effectively denied by imposing the cost and duty of causing his appearance on an adversary. 2 Davis, Administrative Law § 12.9.

I regard the Bureau's position as a callous misreading of the statute. To adopt

---

**2.** *See also* V Wigmore on Evidence § 1362, p. 3 (1974) and 4 Weinsteins on Evidence ¶ 800(01), p. 800–10 and 11 (1988).

**3.** Notes of the Advisory Committee on Proposed Rules [of Evidence] said:

> "Emphasis on the basis of the hearsay rule today tends to center upon the condition of cross-examination. All may not agree with Wigmore that cross-examination is 'beyond doubt the greatest legal engine ever invented for the discovery of truth,' but all will agree

with his statement that it has become a 'vital feature' of the Anglo–American system. 5 Wigmore § 1367, p. 29. The belief, or perhaps hope, that cross-examination is effective in exposing imperfections of perception, memory, and narration is fundamental. Morgan, Foreword to Model Code of Evidence 37 (1942)." *Introductory Note: The Hearsay Problem*, Federal Rules of Evidence, Federal Civil Judicial Procedure and Rules, p. 312–313 (West Publishing Company; 1988).

its position would seriously distort the Administrative Agencies Practice Act. It would allow any agency to shift the cost of bringing an expert witness before it, by simply obtaining a written opinion and relying on it. It is not difficult to visualize that every agency would insist that petitioners were "afforded" cross-examination by the "privilege" of subpoenaing, at their own expense, adverse witnesses whose written reports the agency wants to use. That should not be.

Moreover, the Bureau's position was completely inconsistent with its duties to a claimant under the Workers Compensation Act. The Bureau did *nothing* for the hearing; only Howes offered evidence. That was not a trial-type "hearing"! *Weber v. North Dakota Workmen's Compensation Bureau,* 377 N.W.2d 571 (N.D.1985).

Nothing in the Workers Compensation Act shifts the cost burden of probing the reasons for an adverse medical opinion to a claimant. As one would expect of most claimants, Howes was not even "able to afford any more medical bills" for his headaches, let alone expenses for depositions of physicians. The Bureau is statutorily obligated to pay the reasonable attorneys fees and costs of a claimant from its general fund "after action by the bureau which reduces or denies a claim." NDCC 65–02–08.

Furthermore, the Bureau insisted that Howes' attorney agree to "follow the guidelines of the Workmen's Compensation Bureau on payment of attorney fees and costs in my representation of the claimant" with Bureau payment "as the sole and exclusive remuneration" to the attorney. The Bureau may have reasonable discretion to limit depositions and witness examinations in proper cases, for example, where cumulative. *See* NDREv 403 and *Hayes v. North Dakota Workers Compensation Bureau,* 425 N.W.2d 356 (N.D.1988). But, it cannot fairly prevent cross-examination by effectively shifting the entire expense of its witness to the claimant. The Bureau cannot thus renege on its duty to provide "sure and certain" relief to claimants who are statutorily excluded from "every other remedy." NDCC 65–01–01.

No administrative agency, not even the Bureau, should be allowed to effectively deny cross-examination in trial-type hearings by shifting the cost of its witnesses to claimants. Therefore, I respectfully dissent. Howes was not "afforded" an opportunity for cross-examination and was not accorded a fair hearing.

LEVINE, Justice, dissenting.

I join in that portion of Justice Meschke's rationale that supports the conclusion that Howes was denied a fair hearing because of his inability to cross-examine, at the Bureau's expense, Dr. Peterson, an expert retained by and relied upon by the Bureau.

However, because Dr. Larson was the claimant's physician consulted at the behest of Howes' physicians and not at the behest of the Bureau, I believe that the claimant, not the Bureau, bears the burden to subpoena or depose Dr. Larson.

I would reverse to afford Howes the opportunity to cross-examine Dr. Peterson.