Ronald L. **WENDT**, Appellant,

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee.**

**Civ. No. 900308.**

Supreme Court of North Dakota.

April 2, 1991.

David A. Garaas (argued), Garaas Law Firm, Fargo, for appellant.

Hugh Patrick Seaworth (argued), Asst. Atty. Gen., Bismarck, for appellee.

ERICKSTAD, Chief Justice.

Ronald L. Wendt appeals from a district court judgment affirming an order of the North Dakota Workers Compensation Bureau [Bureau] which denied him disability benefits. We affirm the judgment of the district court.

At the time of the formal hearing before the Bureau, Wendt was a 44-year-old high school graduate with a work history in construction and general labor. He is functionally illiterate, unable to read or write beyond a second grade level. According to a neuropsychologist, Wendt's reading and writing problems stem from an "[o]rganic mental disorder ... of uncertain etiology." Wendt nevertheless has "scored very high percentiles" in mechanical aptitude tests, "[d]emonstrating excellent mechanical and problem solving comprehension." Wendt received training for welding and in 1974, Steiger Tractor, Inc. [Steiger] in Fargo hired him as a small parts welder.

On July 30, 1984, while employed at Steiger, Wendt suffered a work-related injury to his lower back lifting a piece of angle iron. Wendt was treated by Dr. Lee Christoferson, who diagnosed his condition as "marked Grade II spondylolisthesis of L4 and 5 with bilateral spondylolysis." Dr. Christoferson recommended surgery and gave Steiger a return to work evaluation

indicating that Wendt be restricted to lifting no more than 10 pounds and that he "stand/walk" no more than four to six hours in an eight hour work day. These restrictions were to remain in effect until six months after Wendt's surgery. However, Wendt refused the surgery and opted to return to work.

Upon being informed that Steiger would be unable to accommodate employment for Wendt under the restrictions set forth in the return to work evaluation, Dr. Christoferson responded by letter:

"Essentially the only restrictions I placed on Ronald Wendt were no lifting greater than about 30 pounds and repetitive pulling and pushing could aggravate his back. Essentially they are not hard fast restrictions, and I have no record of them in my chart either, although, I may have filled out a form for Steiger stating some of these.

"Again I think he can return to Steiger and perform his activity, but it may aggravate his back condition. It should not cause any serious problems, however."

Wendt returned to work on September 7, 1984. The Bureau paid medical and disability benefits from July 30, 1984, through September 6, 1984.

Because of the work restrictions, Steiger switched Wendt from welding to test driving tractors. Wendt was eventually reassigned to his job as a small parts welder. According to Wendt, Steiger accommodated his work restrictions by providing an overhead crane or air hoist for moving the heavier parts and providing co-workers to assist him in moving heavier parts that could not be moved with the crane.

Between September 1984 and September 1988, Wendt periodically saw doctors regarding his lower back problems. In April 1986 Wendt was evaluated at Mayo Clinic. The doctor noted that Wendt's back problem was not "severe enough to justify surgical treatment. He is working virtually every day with very little compromise in his work or recreational activities, and he does not feel the problem is bad enough to justify surgery." In March 1987 Dr. Christoferson noted that Wendt's spondylolisthe-

sis "is progressing" and that Wendt "at times" feels "a numbness in his legs." Following a routine check-up in May 1988, Dr. Christoferson noted that Wendt "has been getting along fairly well with his spondylolisthesis. Basically no marked problems."

On September 30, 1988, Steiger terminated Wendt's employment for excessive absenteeism. Under a union contract, employees could be dismissed if they had accumulated a certain number of demerit points for being tardy or absent. Wendt had exceeded the limit.

Since then, Wendt has been unsuccessful in his attempts to find employment as a welder. Wendt has been able to find temporary employment through Kelly Services and has been employed as a fertilizer truck driver for a period of several months in the fall of 1988 and again in the spring and summer of 1989, but the most he has been able to earn is $4.50 per hour compared to the $10.94 per hour he had been earning at Steiger. Wendt has, however, worked as much as 16 hours per day, seven days per week, driving fertilizer trucks. Wendt also continued to serve his regular duty schedule with the Naval Reserve, where he is classified as a heavy equipment operator.

After he was discharged from Steiger, Wendt saw Dr. Christoferson, who referred him to Dr. Jeff Stavenger. Dr. Stavenger noted that Wendt's spondylolisthesis was "stable" and that surgery was not warranted because of his lack of symptoms. At Wendt's request, Dr. Stavenger wrote a letter in December 1988 setting forth Wendt's work restrictions:

"He does have a diagnosis of a Grade II spondylolisthesis in the low back. This is a partial slippage of one bone on the other. His back condition does appear to be stable. He should not be lifting more than 40 pounds on a one time basis or 30 pounds on a repetitive basis. He should also avoid repetitive bending, twisting or stooping with the back."

In January 1989 Wendt informed the Bureau that he was having trouble finding employment as a welder because of his work limitations and that he was "perma-

nently and partially disabled" because of his work-related back injury. The Bureau assigned a rehabilitation specialist to assist him. The rehabilitation specialist noted from her interview that Wendt "does not have pain except for an occasional short-term sharp pain in his back. Sitting does not bother him, he can stand up to 10 hours per day at work, and does not have a problem with stairs." The rehabilitation specialist also noted that, after speaking with a Steiger official, "[t]here is no chance that [Wendt] will be reconsidered for re-hire," and that Wendt's "previous vocational experience has been mainly in general labor and it will be difficult to find work in that area based on his current restrictions, but not impossible." Based in part on the rehabilitation specialist's report, the Bureau denied Wendt additional disability benefits on April 13, 1989. Wendt requested a rehearing, which was granted.

At the hearing, Wendt presented Dr. Stavenger's letter opinion stating that Wendt had "Grade II spondylolisthesis of L4 on L5" which resulted in an eight percent "impairment to the whole person." At one point, Dr. Stavenger testified that he agreed with Dr. Christoferson's limitation set forth in the original return to work evaluation that Wendt not "stand/walk" more than four to six hours during an eight hour work day and stated that Wendt would not be able to tolerate standing more than six hours per day. Dr. Stavenger, however, testified on cross-examination that Wendt, on an intermittent basis, could tolerate standing for six and one-half to seven hours per day with short breaks during the day and that the time limit was a "reasonably flexible approximation."

Steiger's former personnel manager testified that Wendt's discharge was not related to his physical condition and that Wendt could still work at one of the 25 welding positions at Steiger had he not been fired for cause. The personnel manager also testified that Wendt and other welders in the same classification were not required to lift more than 30 pounds, and that Wendt was able to perform his welding job in the four years following his back injury without any job modifications. Wendt admitted that small parts welders at Steiger were not required to consistently lift more than 30 pounds.

The Bureau allowed Wendt an eight percent permanent impairment award under § 65–05–12, N.D.C.C., but did not award him any disability benefits. The Bureau found that, after Wendt's 1984 back injury, he "eventually returned to his former job as a welder in the small parts department, without modification of any of the duties of that job." The Bureau also found that:

"VI.

"Claimant was terminated from his position at Steiger Tractor due to excessive tardiness and absenteeism, on September 30, 1988. Claimant was not terminated as a result of the work injury.

"VII.

"Following his return to work in September of 1984, and in the years between 1984 and September of 1988, claimant was able to perform his regular duties and work a regular shift without significant symptoms. Claimant was able to work a regular shift of nine to ten hours per day, most of which time was spent standing, in 1988 in the months before he was fired, without apparent problems.

"VIII.

"The weight of the evidence indicates that claimant has certain medical restrictions resulting from the work injury, which are that he can lift no more than 40 pounds, or 30 pounds on a repetitive basis, and that he must avoid repetitive bending, twisting or stooping with the back.

"IX.

"The greater weight of the evidence indicates claimant is able to work a regular eight hour shift, including work that may require standing of up to seven to eight hours in the regular work shift. . . .

"X.

"The greater weight of the evidence indicates that the claimant's work injury does not prevent him from returning to his former position as a welder at Steiger Tractor and performing all the duties required of that position. The sole reason the claimant is unable to return to work at Steiger Tractor is because he was fired for cause.

"XI.

"The weight of the evidence does not indicate that claimant is unable to perform his former work as a result of the work injury."

In addition to the permanent partial impairment award, the Bureau concluded that Wendt is entitled "to reasonable medical expenses for treatment of" his 1984 work injury. The Bureau also concluded, however, that Wendt is not "disabled as a result of the work injury" and that he "is not entitled to additional disability and/or rehabilitation benefits in connection with the work injury."

The district court affirmed the Bureau's order and Wendt has appealed to this court asserting that the Bureau erred in failing to award him any disability benefits.

Section 28–32–19, N.D.C.C., governs the scope of judicial review of the Bureau's decision in both the district court and this court. *Perman v. North Dakota Workers Compensation Bureau,* 458 N.W.2d 484, 487 (N.D.1990). We must affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of evidence, its conclusions of law are not sustained by the findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Jones v. Workers Compensation Bureau,* 461 N.W.2d 273, 274 (N.D. 1990). In determining whether or not the Bureau's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency. *Howes v. Workers Compensation Bureau,* 429 N.W.2d 730, 734 (N.D.1988), *cert.*

*denied,* 489 U.S. 1014, 109 S.Ct. 1126, 103 L.Ed.2d 189 (1989). Rather, we determine only whether a reasoning mind could have reasonably determined that the factual conclusions were supported by the evidence. *Kopp v. N.D. Workers Compensation Bureau,* 462 N.W.2d 132, 136 (N.D.1990).

I

■ Wendt asserts that the Bureau erroneously failed to accept all of his medical work restrictions. More specifically, Wendt asserts that the Bureau ignored Dr. Stavenger's testimony that Wendt would not be able to tolerate a welding job that required more than six hours of standing per day. We disagree.

The Bureau's finding of fact VIII, which does not include the six-hour standing limitation, essentially quotes Dr. Stavenger's restrictions set forth in the December 1988 letter written at Wendt's behest. The Bureau explained the apparent conflict created by Dr. Stavenger's testimony in its finding that Wendt is able to engage in work that requires standing seven to eight hours per day:

"Dr. Stavenger's opinion that claimant cannot walk or stand for a period of more than six hours in an eight hour shift is not absolute, and Dr. Stavenger acknowledged it is only an estimate. Furthermore, it is based upon a report completed by Dr. Christoferson in 1984 that was premised upon the assumption that the claimant would require surgery for his back condition. Because the claimant did not undergo surgery, Dr. Christoferson later modified the restrictions, and Dr. Christoferson did not impose any limitation on claimant's standing or walking when claimant returned to work in 1984. Also, claimant has in fact worked a regular shift since September of 1984, and he was able to perform his regular duties through September 30, 1988, even though those duties required that he stand at work for a period of up to nine to ten hours. Finally, claimant has, since he lost his job at Steiger Tractor, been able to work as a truck driver

for periods of up to 12 to 16 hours a day."

We believe that the Bureau provided an adequate explanation for rejecting Dr. Stavenger's testimony on the six-hour standing limitation [*e.g., Sloan v. North Dakota Workers Compensation Bureau,* 462 N.W.2d 638, 643 (N.D.1990)], and conclude that the Bureau could reasonably reach its factual determination that a six-hour standing limitation is not a part of Wendt's medical work restrictions.

## II

■ Wendt asserts that he is entitled to total disability benefits because he falls within the "odd-lot" doctrine. Assuming for purposes of argument that the odd-lot doctrine applies in this jurisdiction, we conclude that Wendt has failed to establish that he qualifies for total disability under that doctrine.

A "total disability" exists when a worker is unable, solely because of a job-related injury, to perform or obtain any substantial amount of labor in that particular line of work, or in any other for which the worker would be fitted. *Perman v. North Dakota Workers Compensation Bureau,* 458 N.W.2d 484, 488 (N.D.1990); *Risch v. Workers Compensation Bureau,* 447 N.W.2d 308, 309 (N.D.1989); *Jimison v. North Dakota Workmen's Compensation Bureau,* 331 N.W.2d 822, 827 (N.D.1983); *Lyson v. North Dakota Workmen's Compensation Bureau,* 129 N.W.2d 351, 356 (N.D.1964); § 65–01–02(8), N.D.C.C.[1] We have recognized that a determination of disability involves a blend of two elements, medical or physical inability to perform work and inability to obtain work as a result of a compensable injury. *Perman, supra.* We have also held that it is not error for the Bureau to deny disability benefits to a person who is capable of perform-

ing employment-related activities and has the ability to return to gainful employment. *See Perman, supra; Hintz v. Workers Compensation Bureau,* 450 N.W.2d 727, 729 (N.D.1990); *Froysland v. North Dakota Workers Compensation Bureau,* 432 N.W.2d 883, 890 (N.D.1988); *Claim of Olson,* 419 N.W.2d 894, 897 (N.D.1988); *Jimison, supra.*

We discussed the odd-lot doctrine in *Hayden v. Workers Compensation Bureau,* 447 N.W.2d 489, 495 (N.D.1989):

"Under the 'odd-lot' doctrine, which we have never expressly adopted, disability may be found in the case of a worker, who, while not totally incapacitated for work, is so limited that he will not be employed on a regular basis in any well-known branch of the labor market. The rule followed by most courts has this application:

"'An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled.'

"2 Larson, The Law of Workmen's Compensation, § 57.51(a) (1989), citing *Lee v. Minneapolis St. Ry.,* 230 Minn. 315, 41 N.W.2d 433, 436 (1950). A distinguishing characteristic of odd-lot employment is that of irregularity and unpredictability of the work. The motive behind the rule in some instances is to encourage, or at least not to penalize, commendable efforts by the claimant to find some type of work. Larson, *supra* § 57.51(f). Thus, a claimant may be considered disabled and entitled to benefits, even though he has 'worked' or is 'working' at employment which falls within the odd-lot category."

"a. Performing employment at any suitable gainful employment or occupation for which the employee is reasonably suited by experience or training;
"b. Earning in the same or any other employment the wages the employee was receiving at the time of injury."

---

1. Prior to July 18, 1989, "disability" was defined by § 65–01–02(8), N.D.C.C., as "inability to work as a result of a compensable injury." "Disability" is currently defined in § 65–01–02(12), N.D.C.C.:

"12. 'Disability' means that period of time an employee is totally or partially incapacitated from:

A major aspect of the odd-lot doctrine concerns the burden of proof. The claimant has the burden to make a prima facie showing that a high degree of obvious physical impairment, coupled with other facts such as the claimant's mental capacity, education, training, or age places the claimant in the odd-lot category. *Hayden, supra,* 447 N.W.2d at 498 [quoting 2 Larson, The Law of Workmen's Compensation § 57.61(c) (1989) ]. The burden then shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant. *Hayden, supra.*

Wendt asserts that he has established a prima facie case of odd-lot worker status because he is illiterate; he has a permanent partial impairment equal to eight percent of the whole body under medical guidelines; he has difficulty finding welding jobs because of his medical work restrictions; he has pain and numbness in his leg while standing at the job; his employment since being discharged from Steiger has been irregular and unpredictable; and Steiger accommodated him by giving him "favored" work after his back injury.

Some of Wendt's assertions are contrary to the Bureau's findings. Although Wendt asserts that Steiger gave him "favored" work after his back injury, the Bureau found that, after a period of test driving tractors, Wendt "returned to his former job as a welder in the small parts department, without modification of any of the duties of that job." This finding is supported by the testimony of Steiger's former personnel manager as well as a medical rehabilitation specialist who reviewed the medical records and visited the job site to observe workers doing the work Wendt did at Steiger. According to the rehabilitation specialist, the job duties and physical requirements of the job did not conflict with the work restrictions imposed by Dr. Stavenger in his December 1988 letter.

Additionally, although Wendt has a permanent partial impairment equal to eight percent of the whole body and Wendt testified that he has pain while working, we do not believe this constitutes a high degree of "obvious physical impairment" for purposes of applying the odd-lot doctrine. *Hayden, supra,* 447 N.W.2d at 498. The rehabilitation specialist noted that Wendt "does not have pain except for an occasional short-term sharp pain in his back" and that "he can stand up to 10 hours per day at work." Wendt has not established that the pain accompanying his attempted return to work is "substantial, serious, intense and/or severe." *Hayden, supra,* 447 N.W.2d at 499 [quoting *Knight v. General Acc. Ins. Co.,* 496 So.2d 1141, 1144 (La.Ct. App.1986) ]. Moreover, the record reflects that Wendt has in fact been employed, although not as a welder, for much of the time since being discharged from Steiger. We conclude that Wendt did not establish a prima facie case of odd-lot status, and that the Bureau could reasonably conclude that Wendt is not entitled to total disability benefits. *E.g., Perman, supra; Froysland, supra; Claim of Olson, supra; Jimison, supra.*

### III

Wendt asserts that the Bureau erred in refusing to award him any permanent partial disability benefits under § 65–05–10, N.D.C.C.[2] In *Jimison, supra,*

2. Section 65–05–10, N.D.C.C., was amended, effective July 27, 1989, to provide:

"*65–05–10. Partial disability—Weekly compensation.* If the injury causes temporary partial disability resulting in decrease of earning capacity, the compensation is sixty-six and two-thirds percent of the difference between the injured employee's average weekly wages before the injury and the employee's wage earning capacity after the injury in the same or another employment. However, the partial disability benefits may not exceed an amount equal to sixty-six and two-thirds percent of the employee's average weekly wage at the time of the injury.

"1. It is the burden of the employee to show that the inability to obtain employment or to earn as much as the employee earned at the time of injury, is due to physical limitation related to the injury, and that any wage loss claimed is the result of the compensable injury.

"2. If the employee voluntarily limits income or refuses to accept employment suitable to the employee's capacity, offered to or procured for the employee, such employee is not entitled to any compensation at any time

331 N.W.2d at 827 n. 5, we set forth three factors for determining whether an individual is entitled to partial disability benefits: "First, there should be a physical disability; second, the disability should be partial, or in other words, the employee should be able to work subject to the disability; and third, there should be an actual loss of earning capacity that is causally related to the disability." The Bureau concedes that Wendt meets the first two parts of the three-pronged test, but asserts that Wendt failed to prove an actual loss of earning capacity that is causally related to the disability. Under the unusual circumstances of this case, we agree.

The Bureau essentially determined that any loss of earning capacity suffered by Wendt was not attributable to his 1984 work injury, but was caused by his being discharged for cause by Steiger. We must therefore determine the effect of a discharge for misconduct on entitlement to disability benefits.

In 2 Larson, The Law of Workmen's Compensation § 57.64 (1989), Professor Larson notes that the causal problem of disability becomes further complicated when, adding to medical and economic factors, voluntary conduct on the part of the claimant in the form of misbehavior leading to discharge or demotion contributes to the claimant's unemployment.

"If the record shows no more than that the employee, having resumed regular employment after his injury, was fired for misconduct, with the impairment playing no part in the discharge, it will not support a finding of compensable disability. But if to this record there is added evidence that the claimant has been hampered by his impairment in ob-

taining or holding other employment, the question is not quite so one-sided. A good example of the problem is provided by *Ucci v. Hathaway Bakeries, Incorporated* [75 R.I. 341, 66 A.2d 433 (1949)]. Claimant, a route supervisor for a bakery, sustained a back injury which disabled him for work involving lifting. He received compensation for several months, and then was able to resume his duties as a supervisor. Not long after, he was demoted for fighting, but, since the demotion reduced him to the job of a driver salesman, and since the duties of a driver salesman included carrying boxes of bakery goods which claimant contended he was unable to handle, claimant quit. His subsequent efforts to obtain employment in a hardware store, in a plumbing shop, and elsewhere were unsuccessful because of his physical condition. He got one job in a printing shop, but had to give it up after two days because of his back trouble. Compensation was denied.

"Here we have a man who has, by resuming his old job, proved that he is not incapacitated for the very duties in which he received his injury. He loses that job for independent reasons, and thereafter finds his physical disability a bar to the only kinds of employment available. The medical testimony was that claimant was partially disabled, but could engage in a sedentary occupation. Yet the combination of undisputed medical testimony of partial disability plus present inability to get a job solely because of physical condition does not add up to compensable disability, since claimant through his own fault lost a job for which he was concededly fitted. It is true that claimant's successful return to

during the continuance of such refusal unless, at any time, such refusal is justified in the opinion of the bureau.

"3. No compensation is payable unless the loss of earning power exceeds ten percent. The claimant may earn up to ten percent of the claimant's average gross weekly earnings with no reduction in total disability benefits.

"4. Upon securing suitable employment, the injured employee shall notify the bureau of the name and address of the employer, the date the employment began, and the amount

of wages being received on an annual basis. The injured employee shall notify the bureau whenever there is a change in wages received.

"5. The benefits provided by this section are available to any otherwise eligible worker, providing the loss of earning power occurs after July 1, 1989. Partial loss of earning power occurring prior to July 1, 1989, must be paid at a rate to be fixed by the bureau.

"6. Dependency allowance must be paid under section 65–05–09 on claims receiving benefits under this section."

his regular job is logically an almost insuperable obstacle to finding of disability. Perhaps the only way in which the penalty for a moment's fighting can be adjusted to something more appropriate than forfeiture of all compensation rights would be legislation comparable to those Unemployment Compensation provisions which handle discharge for misconduct and voluntary quitting by a penalty of a limited number of weeks' compensation rather than complete loss of benefits." 2 Larson, The Law of Workmen's Compensation, *supra*, § 57.64(a), at pp. 10–264—10–269 [Footnotes omitted.]

■ Although it has been stated rather broadly in some decisions that "an employee who is discharged for just cause is not entitled to workers' compensation benefits" [*Calvert v. General Motors Corp.*, 120 Mich.App. 635, 327 N.W.2d 542, 546 (1982)], we agree with those courts which hold that a discharge for just cause does not automatically bar an employee from receiving disability benefits. *See Parker v. Eaton Corp.*, 554 So.2d 644, 646 (Fla.Ct. App.1989); *Johnston v. Super Food Services*, 461 So.2d 169, 170 (Fla.Ct.App.1984); *Marsolek v. George A. Hormel Co.*, 438 N.W.2d 922, 924 (Minn.1989); *Woodard v. Workmen's Compensation Appeal Bd.*, 49 Pa.Cmwlth. 558, 411 A.2d 890, 891 (1980). We adopt the approach set forth by the Minnesota Supreme Court in *Marsolek, supra:*

"[A] justifiable discharge for misconduct suspends an injured employee's right to wage loss benefits; but the suspension of entitlement to wage loss benefits will be lifted once it has become demonstrable that the employee's work-related disability is the cause of the employee's inability to find or hold new employment. Such a determination should be made upon consideration of the totality of the circumstances including the usual work search 'requirements.'"

In this case, Wendt does not dispute that he was discharged by Steiger for just cause and does not claim that the discharge was in any way related to his back injury. Ac-

cording to Wendt, he has contacted six prospective employers in the Fargo area and four from out of state about welding jobs since he was discharged by Steiger. Steiger's former personnel manager indicated that jobs similar to Wendt's former job may be available at other area companies. From his interview with Wendt, the neuropsychologist noted that "the reluctance on the part of employers to hire someone who is fired from one job" contributes to Wendt's difficulty in finding employment. Wendt has not applied for any jobs as a heavy equipment operator, an occupation for which he was trained in the Naval Reserves. Wendt testified that he makes two or three inquiries a week at other types of employment. At the time of the hearing, Wendt was temporarily employed as a truck driver. On this record, we cannot say Wendt has demonstrated that, at this time, his work-related injury is the cause of his inability to find suitable employment.

We conclude that the Bureau could reasonably find that Wendt's loss of earning capacity was causally related to his discharge for cause rather than from his disability. Wendt may reapply for disability benefits any time in the future when he can demonstrate a causal connection between his disability and a loss in earning capacity.

Accordingly, the judgment is affirmed.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.