Mike J. MATUSKA, Appellant,

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU,** Appellee,

and

**Funfar Construction, Inc., Respondent.**

Civ. No. 910293.

Supreme Court of North Dakota.

March 23, 1992.

Al Baker of Baker Legal Clinic, Fargo, for appellant.

Dean J. Haas, Asst. Atty. Gen., Workers Compensation Bureau, Bismarck, for appellee.

VANDEWALLE, Justice.

Mike J. Matuska appealed from a district court judgment affirming the Workers Compensation Bureau's order awarding him benefits on a 50 percent aggravation basis. We affirm.

Matuska, while employed by Funfar Construction, Inc., injured his back on October 24, 1989, when he was carrying plywood sheets and shingle bundles on the roof of a house. Matuska did not know he had hurt his back until he returned home from work that evening and later discovered that he "could barely move around." Matuska consulted Dr. Paul Davis, a Fargo chiropractor, the following day.

In his office notes for October 25, 1989, Dr. Davis diagnosed Matuska as having "acute lumbar strain." In the "Doctor's

Report of Injury" sent to the Bureau, Dr. Davis listed as the diagnosis, "acute severe lumbar myospasm." Dr. Davis advised Matuska not to return to work. Matuska received treatments from Dr. Davis on October 25, 26, and 27, 1989, and his symptoms improved. However, by October 30, 1989, Matuska's symptoms had returned. In his office notes for October 30, Dr. Davis said that "Patient reaggrivated (sic) low back this weekend unknown what caused this ... Patient reveals mild left listing." Matuska received additional treatments on October 30 and 31, and November 1 and 2, 1989. On November 1, Dr. Davis noted that "Patient aggrivated (sic) low back last night changing a flat tire with a t-bar ... Lumbar myospasm is increased again. Range-of-motion decreased." Dr. Davis testified that he believed these two "aggravations" would "slow down his recovery by a day or so but not to the point where it was going to take him off work for any extended time."

Matuska's condition improved over the next several days, and on November 4, 1989, Dr. Davis told him he could return to work on November 6, 1989. Dr. Davis testified that Matuska "was responding favorably and didn't need any significant amount of care." Dr. Davis also testified that in releasing Matuska for work, he would have advised him to minimize bending, stooping, heavy lifting, and other activities that might aggravate the soft tissue injury. Matuska was also given a lumbosacral belt to wear at work.

Matuska did not go to work on November 6, but returned to Dr. Davis because he was in pain. Dr. Davis took the following history during his examination: "Patient re-injuried (sic) low back yesterday at home while installing approximately 40 lb shower unit. Patient presents with severe listing and myospasm ... Severe lumbar myospasm, decreased range-of-motion due to the above." Dr. Davis recalled that Matuska told him about installing the shower unit and about "working in fairly tight corners lifting and rotating." Dr. Davis said he questioned Matuska's judgment "in deciding to do that type of work when he was still not totally recovered." Dr. Davis testified that Matuska's condition on November 6 was "significantly worse" than the previous week and that his installation of the shower unit was a "significant, contributing factor" to his present condition. Matuska denied lifting or installing the shower unit and admitted to only helping remove some plastic sheets from a cardboard container.

Suspecting a disc injury that may require surgery, Dr. Davis referred Matuska to Dr. Gale Hazen for a neurological examination. Except for "bulging disks at both L4–5 and L5–S1," Dr. Hazen's diagnosis of "a back injury with subacute low back pain and severe muscle spasm," was similar to Dr. Davis's initial diagnosis on October 25. He determined that surgery would not be necessary. Dr. Hazen referred Matuska to Dr. Scott Turner, whose diagnosis of Matuska was also similar to that rendered by Dr. Davis on October 25. According to Dr. Davis, there has been little, if any, improvement in Matuska's condition since he examined him on November 6, 1989.

The Bureau found that Matuska's "statement that he was in pain all weekend and did not in fact install a shower unit but only held a box is incredible given the history taken by Dr. Davis." The Bureau further found that "[t]he mechanism of injury, the increase in symptoms, the change in [Matuska's] condition from a release to return to work to a significant condition that is not improved all indicate that [Matuska's] injury installing a shower stall was a substantial contributing factor in the development of [Matuska's] current condition." The Bureau concluded that Matuska's "non-employment injury of November 5, 1989, acted upon a prior compensable [October 24, 1989] injury and substantially contributed to the severity, acceleration, and progression of the final result and acted as a trigger to produce recurrent symptoms," thereby justifying an aggravation award pursuant to § 65–05–15(3), N.D.C.C. Because Dr. Davis was unable to apportion the percentage of causation, Matuska was awarded "fifty percent of the total benefits recoverable if one hundred percent of the injury had been the result of employment." Section 65–05–15(4),

N.D.C.C. The district court affirmed the Bureau's decision, and Matuska appealed.

We must affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of evidence, its conclusions of law are not sustained by the findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Pleinis v. N.D. Workers Compensation Bureau,* 472 N.W.2d 459 (N.D.1991); § 28-32-19, N.D.C.C. In determining whether the Bureau's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency. *Latraille v. North Dakota Workers Compensation Bureau,* 481 N.W.2d 446 (N.D.1992). Rather, we determine only whether a reasoning mind could have reasonably determined that the factual conclusions were supported by the evidence. *Diegel v. N.D. Workers Compensation Bureau,* 469 N.W.2d 151 (N.D.1991).

Section 65–05–15(3), N.D.C.C., provides:

"*65–05–15. Aggravation awards.* The bureau shall calculate an aggravation award in case of aggravation of a preexisting condition, disease, or infirmity by a compensable injury, and in case of aggravation of a compensable injury by a nonemployment injury, on the following terms:

\*   \*   \*   \*   \*   \*

"3. In case of aggravation of a prior compensable injury by a nonemployment injury, the aggravation statute may be invoked where the nonemployment injury acts upon the prior compensable injury, and substantially contributes to the severity, acceleration, or progression of the final result, or, if it acts as a trigger to produce recurrent symptoms, and the trigger is itself a substantial aggravating or accelerating factor. All benefits may be apportioned when the aggravation statute is invoked under this subsection. The aggravation statute may not be invoked if the result is but a natural progression of the compensable injury."

Matuska essentially asserts that the Bureau erred in determining that the aggravation statute was applicable in this case because its findings were based on the "precarious opinions of Dr. Davis," the treating physician, which were "so inconsistent that it cannot be considered reasonable to rely" on them. Matuska primarily points out discrepancies in Dr. Davis's deposition testimony, which, according to Matuska, the Bureau did not meet its duty of clarifying as required by *Claim of Bromley,* 304 N.W.2d 412 (N.D.1981), and its progeny.

Matuska notes, for example, that during his deposition Dr. Davis agreed that Matuska's November 5 installation of the shower unit "acted upon a prior compensable injury and substantially contributed to the severity of the claimant's back condition and also acted as a trigger to recurrent symptoms." However, on cross-examination by Matuska's counsel, Dr. Davis also agreed that it "would be possible that what we see on November 6 is actually just the same injury again being irritated so it causes the muscles that (sic) go back into spasm." At another point, Dr. Davis, in regard to the November 5 incident, testified that "[t]hat one was much more significant in the fact that he presented with much more significant objective findings after that injury." On cross-examination, however, Dr. Davis admitted that his "objective findings were essentially the same [on November 6] as the objective findings following his [October 24] injury." Also, Dr. Davis's October 25 office notes reveal a diagnosis of "acute lumbar strain" which was changed to "severe lumbar myospasm" on November 6. Dr. Davis testified on direct examination that he uses the term "severe lumbar myospasm" "quite infrequently." On cross-examination, however, Dr. Davis stated that "I use those [terms] quite frequently interchangeably," and that both terms "mean soft tissue injury to the muscles of the low back." The failure or inability of the Bureau to reconcile these "relevant inconsistencies" and others, according to Matuska, renders it impossible to hold that the Bureau's findings are supported by a preponderance of the evidence. We disagree.

In *Kopp v. N.D. Workers Compensation Bureau*, 462 N.W.2d 132, 135 (N.D.1990), we recounted the evolution of the rule requiring clarification of inconsistencies in medical evidence before the Bureau:

"Although the ultimate resolution of conflicting medical testimony falls with the agency, this Court has required the Bureau to clarify discrepancies among inconsistent medical reports. *DeChandt v. N.D. Workers Comp. Bureau*, 452 N.W.2d 82, 83 (N.D.1990); *Howes v. Workers Compensation Bureau*, 429 N.W.2d 730, 733 (N.D.1988); (quoting *Hayes v. North Dakota Workers Comp. Bureau*, 425 N.W.2d 356, 357 (N.D. 1988)). Initially, we limited the requirement of adequate clarification of discrepancies in medical testimony to situations involving internal conflicts in the attending physician's report. *Bromley*, 304 N.W.2d at 417. Later, we expanded the requirement to include situations involving two reports by the same physician which contained conflicting opinions. *Roberts v. North Dakota Workmen's Compensation Bureau*, 326 N.W.2d 702, 706 (N.D.1982). Finally, in 1985, this Court remanded a decision to clarify discrepancies between two different physicians. *Weber v. North Dakota Workmen's Compensation Bureau*, 377 N.W.2d 571, 574 (N.D.1985). Although we are continuing to shape the principles which govern the Bureau's treatment of inconsistent medical evidence, we must continually bear in mind the basic rule first articulated by Justice Sand: 'Normally, it is within the province of the administrative agency, not the courts, to weigh conflicting medical opinions and to resolve these conflicts.' *Bromley*, 304 N.W.2d at 417 (citing *Hassler v. Weinberger*, 502 F.2d 172 (7th Cir.1974))."

■ The "relevant inconsistencies" in this case were created by Matuska's cross-examination of his own treating physician. In effect, Matuska's cross-examination was an attempt to impeach the credibility of his treating physician, Dr. Davis. We recognize that physicians are often reluctant to state their attributions of causes of an injury or condition in absolute terms. *See, e.g., Sloan v. North Dakota Workers Compen-*

*sation Bureau*, 462 N.W.2d 638, 643 (N.D. 1990) [affirming finding that claimant's Wisconsin injury was the cause of his disability even though treating physician "was reluctant to say that the Wisconsin injury was the sole cause of his disability"]. A physician's agreement with leading questions as to possible alternative causes or diagnosis creates apparent inconsistencies which often cannot be reconciled. So too, impeachment of a witness will also create inconsistencies in testimony which are incapable of reconciliation. Applying the *Bromley* rule under these circumstances would place an unwarranted restriction on the Bureau's ability to act on virtually any claim that has been subjected to the hearing process. Although the inconsistencies attacked in this case may affect the credibility of the witness, we do not believe they are the type of inconsistencies in the medical evidence to which the *Bromley* rule should apply. We therefore conclude that the Bureau did not err in considering Dr. Davis's testimony merely because of inconsistencies arising from cross-examination of the doctor.

■ Matuska asserts that the Bureau failed to consider, or explain its reasons for disregarding, medical evidence favorable to him provided by Dr. Hazen and Dr. Turner. Matuska contends that the Bureau ignored reports of Dr. Hazen and Dr. Turner stating that they were treating Matuska for his October 24 work injury and that they were treating him for the same condition that was originally diagnosed by Dr. Davis on October 25. However, the reports of Dr. Hazen and Dr. Turner are based upon the history as related by Matuska during his examinations. Neither report mentions the November 5 shower unit incident. Indeed, in a March 9, 1990, letter to the Bureau, Dr. Hazen stated that "my original History and Examination of November 21, 1989, shows that the patient related his present illness to injuries of October 20, 1989 (sic) while at work. He did not at all mention this week-end shower lifting incident." It was therefore reasonable for the Bureau to determine that Matuska did not provide a complete history to either Dr. Hazen or Dr. Turner. The Bureau's failure to specifical-

ly recite in its findings this obvious flaw in the medical reports of Dr. Hazen and Dr. Turner was not error.

■ Matuska also asserts that the Bureau erred in accepting Dr. Davis's history of the shower unit incident rather than his own explanation. We have previously declined "to extend the principle applied where inconsistent medical evidence is present to every factual discrepancy that might arise from the testimony of interested nonexpert witnesses." *Schaefer v. North Dakota Workers Comp.*, 462 N.W.2d 179, 183 (N.D.1990). Whether Matuska installed a shower unit or merely helped remove plastic sheets from the container is not a subject of expert testimony and merely presented an ordinary question of credibility for the Bureau to resolve. The Bureau did not err in accepting Dr. Davis's history over Matuska's account of the incident.

■ Prior to the November 5 injury, Dr. Davis had released Matuska to return to work and expected to discharge him from further care. It is clear that Dr. Davis considered Matuska's condition to be significantly worse on the November 6 examination than it had been on previous examinations. Dr. Davis believed the mechanism of Matuska's November 5 injury was consistent with a disc injury that may require surgery. Dr. Davis did not believe that Matuska's symptoms on November 6 were a natural progression of his October 24 work injury. We cannot say that Matuska's actions of lifting and rotating to install a 40 pound shower unit are, as a matter of law, analogous to ordinary, every day non-employment exertions, such as a "'sneezing episode'" that causes additional injury and "'which is nothing more than ... a further medical complication flowing from a compensable injury.'" *Sloan, supra,* 462 N.W.2d at 642 [quoting 1 A. Larson, *Workmen's Compensation Law* § 13.11(a) at p. 3–516 (1990)]. Under these circumstances, the Bureau did not err in awarding Matuska benefits on a 50 percent aggravation basis.

We conclude that the Bureau's findings are supported by a preponderance of the evidence, that its conclusions are sustained by the findings, that its decision is supported by the conclusions, and that its decision is in accordance with the law. Therefore, the judgment of the district court is affirmed.

ERICKSTAD, C.J., and LEVINE and MESCHKE, JJ., concur.

O'KEEFE, District Judge, sitting as a member of the Court to fill the vacancy created by the resignation of GIERKE, J. Justice JOHNSON not being a member of this Court at the time this case was heard did not participate in this decision.