David T. WHERRY, Appellant,

v.

NORTH DAKOTA STATE HOSPITAL,
Respondent,

and

North Dakota Workers' Compensation
Bureau, Appellee.

Civ. No. 920272.

Supreme Court of North Dakota.

March 24, 1993.

Richard L. Schnell, Mandan, and Maury C. Thompson, Bismarck, for appellant.

Dean J. Haas, Asst. Atty. Gen., Bismarck, for appellee.

SANDSTROM, Justice.

David T. Wherry appeals from a district court judgment affirming an order of the North Dakota Workers' Compensation Bureau denying him benefits. We affirm.

During the course of his employment as a child care counselor at the North Dakota State Hospital, Wherry sustained injuries to his head and body when a resident assaulted him with a pipe on May 2, 1987. Wherry was taken to the emergency room for treatment for a scalp laceration and bodily injuries. The attending physician, Dr. Hsu, reported that Wherry was "awake & alert" during that treatment. On June 23, 1987, Wherry saw Dr. Tello for headaches. Dr. Tello's report indicated that Wherry "was not knocked unconscious" during the assault and recommended "a brain CT [to] rule out a subdural hematoma. If that is negative, I think he has just got post head trauma headaches and they should, hopefully, self resolve." A CT scan on July 8, 1987, indicated a "[n]egative CT imaging of the head" and that "[n]o intracranial pathology is demonstrated."

When the 1987 injury occurred, Wherry was thirty-nine years old and had had epilepsy since he was thirteen. On July 9, 1987, Wherry received emergency room treatment for a seizure. His treating physician, Dr. Laraway, attributed that seizure to Wherry's failure to take anti-seizure medication for the previous two days and reported that, in a "postictal confusion," Wherry fell and "had an abrasion and hematoma develop on his left scalp area."

The Bureau accepted liability for Wherry's 1987 work injury, paid his related medical expenses, and awarded him disability benefits from May 3, 1987, through July 31, 1987, when he returned to work at the State Hospital. Wherry quit working at the State Hospital on July 15, 1988. According to his termination notice, he quit to seek new employment and to further his education. He then worked in a child care program at Luther Hall in Fargo from August 1988 until July 1989.

In June 1989, Wherry saw Dr. Steven Julius about his medication for epileptic seizures. Dr. Julius reported that Wherry had experienced epileptic seizures since he was thirteen and that Wherry "denie[d] any other medical problems." Dr. Julius noted that Wherry was "alert, in no acute distress" and diagnosed Wherry as suffering from "primary generalized epilepsy."

In September 1989, Dr. Scott Farmer treated Wherry after an attempted suicide. Dr. Farmer reported that Wherry's current problems were the result of a failed personal relationship and that he showed signs of depression, sleeplessness, lack of energy, and lack of concentration and memory. Dr. Farmer referred Wherry to a neuropsychologist, Dr. Gregory Hauge, for evaluation of Wherry's cognitive and memory difficulties.

Dr. Hauge's medical history noted Wherry's epilepsy and also indicated a history of "significant drug and alcohol abuse," but that Wherry had received alcohol treatment in 1985 and had not indulged since. Dr. Hauge reported that Wherry complained of "progressive memory difficulty over the past six months," and diagnosed Wherry as having a frontal lobe dysfunction "consistent with a countrecoup injury ... [which] would likely be the result of the assault he suffered in 1987."

After receiving Dr. Hauge's report, Dr. Farmer noted

"some difficulties seeing a clear case for causation ... [for purposes of workers' compensation because] of documented non-compliance with his anticonvulsants leading to a track record of anticonvulsant withdrawal-induced seizures. There is much professional belief and adequate pathological evidence that repeated seizuring with the resulting interruption of ventilation of the patient can lead to discrete ischemic damage to the brain. Also, Mr. Wherry has a significant drug and alcohol abuse history (although Mr. Wherry's deficiencies do not cluster in the pattern which would be expected of a

chronic alcoholic, this weakens his case). Additionally, I have shared Mr. Wherry's concern regarding his HIV status. He was tested for HIV in 02–88 and this was negative. However, my concern regarding his HIV status is extreme in that it is well recognized that AIDS-associated dementia frequently presents initially as a depression and that only later are significant cortical defects manifested."

Wherry applied for further workers' compensation benefits, asserting that the 1987 injury caused a change in his seizure pattern and a severe loss of memory, resulting in disability.

The Bureau retained Dr. Larry Fisher, a board certified neuropsychologist, who examined Wherry in July 1990. Dr. Fisher noted that Wherry had "a lifelong history of epilepsy, a long history of alcoholism, and was treated for a depressive disorder," and had "numerous minor head injuries from falls stemming from his convulsive disorder." Dr. Fisher concluded that Wherry suffered from a disabling frontal lobe dysfunction attributable to "a developing early dementia picture of uncertain etiology." However, Dr. Fisher concluded that Wherry's 1987 injury was not the cause of his current cognitive and memory difficulties:

"With regard to the possibility of a traumatic injury, I do not feel that these test results would be consistent with the pattern I would expect in a trauma. Typically a trauma of this type would produce cortical contusions rather than a primarily subcortical pattern of dysfunction. Also his history of having had no loss of consciousness and having no amnesia surrounding the events of the injury suggest that he really never did sustain a very significant brain injury. He was also able to go back to work without difficulty and only in retrospect does he now recall having had some memory problems. His memory difficulty really has only become evident in the last year or year and one-half along with other problems associated with depression and comprehension and he is really only speculating that these problems have anything to do with the head injury.

In fact, it is very unusual for a head injury to produce very little impairment immediately and instead produces more significant impairment years later. The opposite pattern is typical of a traumatic injury. Therefore, it is my opinion that the problems we are seeing neuropsychologically and the problems that he is complaining about in terms of memory and cognition have nothing to do with his head trauma. I can find no evidence that he actually suffered any brain damage as a result of that injury and instead I feel that he has a separate and independent disease going on the last year and one-half. The etiology of this disease is uncertain but it would be consistent with a number of possibilities. The first would be AIDS demential [sic] complex which would produce a pattern exactly like this. Although he tells me he has had tests which have been negative, I would nevertheless advise him to follow with his physician the progress of his neurological dysfunction, but it certainly does look like the early stage of an AIDS dementia complex. Of course he could have other diseases of the frontal lobes and he should follow through with neurological investigation of the alternative diseases, because he may [have] an acute and progressive disorder having nothing to do with an old injury. I cannot rule out the possibility of anoxic damage from repeated seizuring, but I do not feel that we are looking at any alcoholic encephalopathy since this pattern is very inconsistent with what one sees ordinarily in that disorder."

The hearing officer adopted Dr. Fisher's opinion and found that Wherry had failed to prove a causal relationship between his 1987 injury and his current frontal lobe dysfunction. The Bureau thus denied Wherry benefits. The district court affirmed the Bureau's decision, and Wherry appealed.

Wherry argues that the Bureau erred in not clarifying inconsistencies in the medical evidence and in failing to adequately explain why it disregarded evidence favorable to him. He asserts that the Bureau's find-

ing that his current frontal lobe dysfunction was not causally related to his 1987 injury is not supported by a preponderance of the evidence.

Under Section 28–32–21, N.D.C.C., for our review of the Bureau's decision, we use the same N.D.C.C. § 28–32–19 standards as the district court. We must affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not sustained by its findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Kuklok v. North Dakota Workers' Compensation Bureau*, 492 N.W.2d 572 (N.D.1992); *Matuska v. North Dakota Workers Compensation Bureau*, 482 N.W.2d 856 (N.D.1992). In determining whether the Bureau's findings of fact are supported by a preponderance of the evidence, we exercise restraint and do not make independent findings of fact or substitute our judgment for that of the Bureau. *Kuklok, supra; Matuska, supra.* Rather, we determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached by the Bureau were proved by the weight of the evidence from the entire record. *Kuklok, supra; Matuska, supra.*

To participate in the workers' compensation fund, N.D.C.C. § 65–01–11 requires a claimant prove a compensable injury by a preponderance of the evidence. *Moses v. North Dakota Workers Compensation Bureau*, 429 N.W.2d 436 (N.D. 1988). The claimant must prove a causal connection between employment and an injury. *Id.* The Bureau does not have the burden of proving that the claimant is not entitled to benefits, or that the claimant's injury is unrelated to employment. *Howes v. North Dakota Workers Compensation Bureau*, 429 N.W.2d 730 (N.D.1988), *cert. denied*, 489 U.S. 1014, 109 S.Ct. 1126, 103 L.Ed.2d 189 (1989); *Gramling v. North Dakota Workmen's Compensation Bureau*, 303 N.W.2d 323 (N.D.1981).

In reconciling the claimant's burden of proof with our standard of review of a decision based upon conflicting medical evidence, we require the Bureau to clarify inconsistencies and adequately explain its rationale for disregarding medical evidence favorable to the claimant. *Kuklok, supra.* In *Kopp v. North Dakota Workers Compensation Bureau*, 462 N.W.2d 132, 135 (N.D.1990), we explained the evolution of that requirement:

"Although the ultimate resolution of conflicting medical testimony falls with the agency, this Court has required the Bureau to clarify discrepancies among inconsistent medical reports. *DeChandt v. N.D. Workers Comp. Bureau*, 452 N.W.2d 82, 83 (N.D.1990); *Howes v. N.D. Workers Compensation Bureau*, 429 N.W.2d 730, 733 (N.D.1988); (quoting *Hayes v. North Dakota Workers Comp. Bureau*, 425 N.W.2d 356, 357 (N.D. 1988)). Initially, we limited the requirement of adequate clarification of discrepancies in medical testimony to situations involving internal conflicts in the attending physician's report. *Bromley*, 304 N.W.2d at 417. Later, we expanded the requirement to include situations involving two reports by the same physician which contained conflicting opinions. *Roberts v. North Dakota Workmen's Compensation Bureau*, 326 N.W.2d 702, 706 (N.D.1982). Finally, in 1985, this Court remanded a decision to clarify discrepancies between two different physicians. *Weber v. North Dakota Workmen's Compensation Bureau*, 377 N.W.2d 571, 574 (N.D.1985). Although we are continuing to shape the principles which govern the Bureau's treatment of inconsistent medical evidence, we must continually bear in mind the basic rule first articulated by Justice Sand: 'Normally, it is within the province of the administrative agency, not the courts, to weigh conflicting medical opinions and to resolve these conflicts.' *Bromley*, 304 N.W.2d at 417 (citing *Hassler v. Weinberger*, 502 F.2d 172 (7th Cir.1974))."

In this case, Dr. Hauge and Dr. Fisher agreed that Wherry currently suffers from a disabling frontal lobe dysfunction. However, they disagreed about whether Wherry's current disorder was causally related

to the 1987 injury. Dr. Hauge and Dr. Fisher agreed that typical symptoms of a causal relationship between a trauma and brain damage are loss of consciousness at the time of the trauma and memory loss immediately after the trauma. Although Wherry testified that he began experiencing memory difficulties shortly after the 1987 injury, there was also evidence from his medical records and history which indicated that his cognitive and memory difficulties were progressive and recent, and that he did not lose consciousness at the time of the 1987 injury. Wherry testified in detail about the events during the 1987 assault. There was also evidence that, after the assault, he returned to work at the State Hospital and performed satisfactorily with no memory difficulties and no complaints at that time.

Relying upon Wherry's medical records and history, the hearing officer found that Wherry had not sustained a loss of consciousness and had a detailed recollection of events during the 1987 assault; that after the accident, he had returned to work with no significant loss of memory and had a good performance appraisal at work; and that his memory loss was recent. The hearing officer then explained:

"XV.

"Claimant's prior medical history is significant in that claimant has had a long standing seizure disorder. Claimant has abused alcohol in the past. Both of these factors can produce some brain damage. However, neither physician was comfortable in indicating that all of claimant's frontal lobe dysfunction was related to the use of alcohol or due to the seizure disorder. However, Dr. Larry Fisher indicated that based upon the history of no loss of consciousness from the May 2, 1987, assault and no loss of function in memory for the one year when he returned to work at the North Dakota State Hospital that he did not believe that claimant's blow to the head on May 2, 1987, caused the frontal lobe dysfunction. Dr. Gregory Hauge indicated his opinion that claimant's frontal lobe dysfunction is related to the May 2, 1987,

injury. Dr. Hauge agreed that whether there was loss of consciousness at time of injury would be an important factor in determining the extent of the injury. Dr. Hauge also agreed that the memory loss would have to be present all along. Dr. Hauge speculated that the loss of memory was simply masked. However, because I have found that the evidence does not indicate that claimant sustained a loss of memory during this period of time, I reject Dr. Hauge's opinion. Dr. Hauge essentially relates the frontal lobe dysfunction to the head injury of May 2, 1987, simply because he cannot find another cause. However, this logic does not suffice as there are many other causes of frontal lobe dysfunction. Claimant has simply not met his burden of showing a causal relationship between the frontal lobe dysfunction and his May 2, 1987, head injury.

"XVI.

"I credit Dr. Fisher's opinion over that of Dr. Hauge's because Dr. Fisher takes into the account the fact that the May 2, 1987, head injury did not result in loss of consciousness and also takes into account the fact that the evidence indicates that claimant did not have a significant memory dysfunction for one year when he returned to work at the North Dakota State Hospital. Moreover, Dr. Fisher does not make the logic error that simply because he cannot find another cause he must attribute it to the May 2, 1987, injury. Dr. Hauge's opinion that the May 2, 1987, injury caused the frontal lobe dysfunction is nothing more than a logic error since he does not know another cause. Dr. Hauge ignored that the fact that other agents can cause a frontal lobe dysfunction, including combinations of a seizure disorder and alcohol use. Dr. Hauge simply glosses over the fact that *the history* is inconsistent with brain dysfunction due to the May, 1987 injury." [Emphasis in original].

■■■■ The hearing officer's decision thus explained that he accepted Dr. Fisher's opinion and rejected Dr. Hauge's opinion because Dr. Fisher's opinion was con-

sistent with the evidence from Wherry's medical records and history. We have said that the Bureau adequately explains its reasons for rejecting medical evidence favorable to the claimant when the evidence rejected by the Bureau does not adequately account for a claimant's pre-accident history. *Kuklok, supra.* An adequate explanation for the Bureau's rejection of evidence favorable to the claimant may be provided in the Bureau's analysis of why it accepted contrary evidence. *Kopp, supra.* The Bureau's rationale for adopting Dr. Fisher's opinion and rejecting Dr. Hauge's opinion provided an adequate explanation for its decision.

Although Dr. Fisher did not identify a cause for Wherry's current condition, Dr. Fisher diagnosed Wherry as having "a developing early dementia picture of uncertain etiology" and "an acute progressive disease, rather than an old head injury, ... some other progressive new disease." Nevertheless, Dr. Fisher indicated that, based on Wherry's medical records and history, there was not a causal relationship between the 1987 injury and his current condition. Medical experts are often reluctant to state their attributions of causes of an injury or condition in absolute terms [*Matuska, supra* ], and Dr. Fisher's reluctance to identify one specific cause for Wherry's current condition does not undermine his conclusion that the 1987 injury did not cause Wherry's current condition. More importantly, Wherry had the burden of establishing a causal relationship [*Howes, supra; Gramling, supra* ], and that burden is not satisfied by surmise, conjecture, or mere guess. *Inglis v. North Dakota Workmen's Compensation Bureau,* 312 N.W.2d 318 (N.D.1981); *Kuntz v. North Dakota Workmen's Compensation Bureau,* 139 N.W.2d 525 (N.D.1966).

▪ As Dr. Fisher testified on cross-examination, the difference of opinion between himself and Dr. Hauge as to the cause of Wherry's current condition was an area "for reasonable, competent people to differ in opinion." In weighing those opinions with Wherry's medical records and history, we conclude a reasoning mind rea-

sonably could have determined that the conclusion reached by the Bureau was proved by the weight of the evidence from the entire record. The Bureau's finding that Wherry failed to prove a causal connection between his 1987 injury and his current frontal lobe dysfunction is therefore supported by a preponderance of the evidence.

Accordingly, we affirm the district court judgment.

VANDE WALLE, C.J., and NEUMANN, LEVINE and MESCHKE, JJ., concur.