Filed 6/8/00 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2000 ND 122

Barbara Negaard-Cooley, Claimant and Appellant

v.

North Dakota Workers

Compensation Bureau, Appellee

and

Farstad Oil, Inc., Respondent

No. 990341

Appeal from the District Court of Ward County, Northwest Judicial District, the Honorable Gary A. Holum, Judge.

REVERSED AND REMANDED.

Opinion of the Court by VandeWalle, Chief Justice.

Dean J. Haas, Dietz, Little & Haas, 2718 Gateway Ave., #301, Bismarck, N.D. 58501, for claimant and appellant.

Lawrence A. Dopson, Special Assistant Attorney General, P.O. Box 1695, Bismarck, N.D. 58502-1695, for appellee.

Negaard-Cooley v. North Dakota Workers Compensation Bureau

No. 990341

VandeWalle, Chief Justice.

[¶1] Barbara Negaard-Cooley appealed from a judgment affirming a Workers Compensation Bureau order denying her medical benefits after October 23, 1997, for psychiatric treatment of clinical depression.  Because the Bureau failed to explain internal discrepancies in a medical report it relied on to deny Negaard-Cooley’s claim, we reverse the judgment and remand to the Bureau for further proceedings to clarify those discrepancies.

I

[¶2] Negaard-Cooley filed a claim for workers compensation benefits in connection with an injury to her left upper extremity on July 16, 1993, while employed as a waitress at Perkins Restaurant in Minot.  She had a ganglion cyst removed from her left wrist, a carpal tunnel release, and received physical therapy and injections for a rotator cuff syndrome.  Negaard-Cooley was also diagnosed with reflex sympathetic dystrophy (“RSD”) and was given a series of treatments to attempt to alleviate the pain associated with this condition.  The Bureau accepted her claim and Negaard-

Cooley received total disability benefits until she returned to employment in February 1994.

[¶3] Negaard-Cooley filed a second claim in connection with an injury to her right upper extremity on April 18, 1995, while employed as a telemarketer at the Dacotah Marketing Division of Farstad Oil, Inc., in Minot.  Negaard-Cooley was diagnosed with right carpal tunnel syndrome and underwent unsuccessful treatments for  chronic pain.  During this period of time, Negaard-Cooley’s physician began prescribing medication for her depression.  Negaard-Cooley’s physician advised her to discontinue working in September 1995.  The Bureau accepted Negaard-Cooley’s claim, and reinstated her total disability benefits, which she continues to receive.

[¶4] Negaard-Cooley did not receive formal counseling for psychiatric problems until June 1997, following an altercation resulting in her incarceration for assault.  She has been receiving psychological counseling and psychiatric treatment since then, and is currently diagnosed with clinical depression.  The Bureau accepted responsibility for treatment of Negaard-Cooley’s depression following her work injury until October 23, 1997.

[¶5] After Negaard-Cooley underwent an independent medical examination (“IME”) by a psychologist in March 1998, the Bureau issued an order discontinuing any benefits in connection with her depression beyond October 23, 1997, because “the evidence does not indicate that claimant’s continued problem with depression is related to her April 18, 1995, work injury.”  Negaard-Cooley has experienced a series of traumatic personal events since her birth in 1952, including a history of spousal abuse, divorce, loss of custody of her children, and the deaths of several loved ones.  The Bureau took the position these life experiences of Negaard-Cooley caused her depression, not her work injuries.  Negaard-Cooley argued chronic pain from her work injuries was a substantial contributing factor to her clinical depression, for which the Bureau was responsible.  Following a hearing on the issue, the administrative law judge (“ALJ”) upheld the Bureau’s order.  The ALJ found:

Negaard-Cooley has failed to prove a cause and effect relationship between her current depression condition and her work injury.  Her current depression condition is due to a pre-existing condition which would have progressed similarly in the absence of her April 18, 1995 work injury. . . .  Negaard-Cooley’s current condition is due to a natural progression of her depression condition.

The Bureau adopted the ALJ’s recommended decision, and the district court affirmed the Bureau’s decision.

II

[¶6] Negaard-Cooley contends the Bureau’s findings are not supported by the evidence because the Bureau failed to adequately explain the grounds for crediting the opinion of the psychologist who performed the IME, and discrediting the opinions of her treating doctors; and because the Bureau did not adequately evaluate the parts of the IME report favorable to her.

[¶7] On appeal, we review the Bureau’s decision.  
Siewert v. North Dakota Workers Compensation Bureau
, 2000 ND 33, ¶ 18, 606 N.W.2d 501.  Under N.D.C.C. §§ 28-32-19 and 28-32-21, we must affirm the Bureau’s decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, its decision is not in accordance with the law or violates the claimant’s constitutional rights, or its rules or procedure deprived the claimant of a fair hearing.  
Mikkelson v. North Dakota Workers Compensation Bureau
, 2000 ND 67, ¶ 7, 609 N.W.2d 74.  In determining whether the Bureau’s findings of fact are supported by a preponderance of the evidence, we exercise restraint and do not make independent findings or substitute our judgment for that of the Bureau, but determine only whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire record.  
Renault v. North Dakota Workers Compensation Bureau
, 1999 ND 187, ¶ 16, 601 N.W.2d 580.

[¶8] Negaard-Cooley had the burden of proving by a preponderance of the evidence her depression was causally related to her work injury. 
See
 N.D.C.C. § 65-01-11; 
Siewert
, 2000 ND 33, ¶¶ 15, 20, 606 N.W.2d 501; 
Kackman v. North Dakota Workers Compensation Bureau
, 488 N.W.2d 623, 624-26 (N.D. 1992). To establish that causal connection, a claimant need not prove her employment was the sole cause of injury, and it is sufficient if the work condition is a substantial contributing factor to the injury. 
See
 
Elter v. North Dakota Workers Compensation Bureau
, 1999 ND 179, ¶ 15, 599 N.W.2d 315; 
McDaniel v. North Dakota Workers Compensation Bureau
, 1997 ND 154, ¶ 12, 567 N.W.2d 833.  The Bureau was presented with several medical opinions about the possible cause of Negaard-Cooley’s clinical depression.  These opinions were rendered by Dr. Melissa Ray, an osteopath who treated Negaard-Cooley from 1995 until March 1998; Dr. Barry Greenspan, a psychologist who treated her from June 1997 until June 1998; Dr. John Garofalo, a psychiatrist who treated her from September 1997 until February 1998; Dr. Thomas Eick, a psychiatrist who has treated her since April 1998; and Dr. John Hung, the IME psychologist who examined Negaard-Cooley and her medical records on March 24, 1998.

[¶9] Dr. Ray noted that Negaard-Cooley’s problems with her upper extremities caused severe daily pain and were impacting her activities.  On March 16, 1995, Dr. Ray reported, “[a]s a result of this injury, this patient reports that she experiences insomnia secondary to pain and depression secondary to her limitations.”  Dr. Ray first prescribed an antidepressant drug for Negaard-Cooley in August 1995.  Dr. Ray was unable to assist Negaard-Cooley with her physical problems, and advised her in March 1996 to enter a chronic pain program to help her live with those problems.  After referring her for psychological counseling in June 1997, Dr. Ray noted Negaard-Cooley’s “depression is more or less a personal condition.  Her depression is, in part, relating to her physical pain as well, but there is certainly a fairly good amount of a personal component at present here.”

[¶10] Dr. Greenspan first saw Negaard-Cooley in June 1997, and noted one of her problems was “[d]epression, [a]nxiety, and pain due to RSD.”  Dr. Greenspan’s notes indicate several sessions were spent focusing on her chronic pain, the limited use of her hands, and visualizing to cope with the pain.  Dr. Greenspan further noted in an individual readmission assessment that Negaard-Cooley “is experiencing ongoing depression and anxiety.  There are apparently some issues from her past that need to be dealt with, namely, her two previous marriages and loss of custody of her children.”  In a July 15, 1997 session note, Dr. Greenspan also indicated Negaard-

Cooley was “overwhelmed at [one and a half years of age], both for her own surgery [to remove a growth on her back], her father’s death, and how her mother impacted upon Barbara in dealing with her own stresses and anxieties.”

[¶11] Dr. Garofalo reported on September 4, 1997, that Negaard-Cooley described a “depressed mood for approximately 25 years, which has gotten increasingly worse since her injury happened four years ago.”  Negaard-Cooley had seen a psychiatrist a few times nine years earlier but quit because she did not like the person.  Dr. Garofalo noted several problem areas the pain program needed to address: “[i]neffective individual coping, disturbed support network;” “[l]ack of post treatment support for healthy psychosocial functioning;” “[d]epression;” “[d]isturbed interpersonal relationships;” and “[a]nxiety/panic disorder.”  Dr. Garofalo diagnosed Negaard-Cooley with “[d]epressive disorder, secondary to chronic pain” and suspected “a somewhat passive-dependent personality disorder.”  In February 1998, Dr. Garofalo listed her diagnosis as “[d]epressive disorder, not otherwise specified, secondary to chronic pain.”

[¶12] In June 1998, Dr. Eick noted Negaard-Cooley had “Adjustment Disorder w/Depressed and Anxious Features (chronic in nature) Secondary to her chronic illness.”  In a June 1998 letter to the Bureau, Dr. Eick said “I do feel that her depression is secondary and directly related to her chronic medical and physical problems.  This would also include the chronic pain that she deals with as well.”

[¶13] On the advice of Dr. Ray and Dr. Garofalo, the Bureau had Negaard-Cooley undergo an independent psychiatric evaluation “to document if the patient’s ongoing need for psychiatric care is relating to the work injury or not.”  Dr. Hung issued a 20-

page IME report, in which he diagnosed her with “a clinical depression at this time, along with anxiety features.”  Dr. Hung reported “[t]here are strong indications that the difficulties with depression and anxiety dated back to age 18 when she was in a dysfunctional marriage with physical abuse by an alcoholic husband,” and “[s]ince then there has been subsequent difficulties with depression and stress, usually associated with situational stressors such as losing custody of her children, death of significant other, and work-related physical injuries.”  Dr. Hung also diagnosed Negaard-Cooley with somatoform pain disorder, which is a pain disorder associated with both psychological factors and a general medical condition.  This diagnosis was made because of Negaard-Cooley’s “chronic pain focus, subjective complaints that are inconsistent with and/or disproportionate to objective findings, her self-limiting lifestyle marked disability along with a self-perception of total vocational disability, as well the role that psychological factors (her depression, anxiety, and personality disorder especially with inadequate coping mechanisms) are contributing to her physical complaints.”  Dr. Hung also observed Negaard-Cooley’s “longstanding history of multiple dysfunctional relationships (including her current one) and her grossly ineffective and self-defeating coping style are consistent with the presence of a personality disorder, with dependent, avoidant and self-defeating features.”

[¶14] Dr. Hung concluded:

There are indications that at the time of her 04-18-95 right arm injury, Ms. Negaard-Cooley was already experiencing difficulties with depression and anxiety, related to limitations in physical activities stemming from her 07-93 work injury, grief over the sudden death of a boyfriend of four years whom she had planned on marrying, unresolved grief over loss of custody of her children, and being involved in a dysfunctional relationship with her new boyfriend who was verbally abusive.  There may also have been some features of a somatoform pain disorder related to her left upper extremity difficulties from the 07-93 injury, although I cannot ascertain that within a reasonable degree of psychological certainty.  Ms. Negaard-Cooley’s personality disorder and her history of multiple dysfunctional relationships, inadequate social support network, and ineffectual individual coping are all longstanding and predated her 04-95 work injury.

It is likely that Ms. Negaard-Cooley’s 04-18-95 right arm injury and ensuing physical difficulties aggravated the aforementioned depression.  However, by the time that she completed the TLC pain management program around 10-97, Ms. Negaard-Cooley’s depression was primarily related to the difficulties in her dysfunctional relationship with her boyfriend, her self-perception of total vocational disability, and the consequences of her longstanding maladaptive personality style (ineffectual coping, inadequate social support network, no direction in her life).  Similarly, while the 04-18-95 right arm injury may have aggravated or precipitated the somatoform pain disorder, by 10-97 Ms. Negaard-Cooley’s chronic pain focus and somatoform pain disorder was mediated by other factors including her self-perception of disability, secondary gains associated with being disabled (financial compensation, being excused from functioning in a productive and independent manner), the likely influences of other disabled role models (her stepfather since the 1970's, her older sister for the past three years), and of course Ms. Negaard-Cooley’s depression related to unresolved grief over various past losses.  It is my opinion, within a reasonable degree of psychological certainty, that at this time there is no significant relationship between Ms. Negaard-Cooley’s depression/pain disorder and her 04-95 injury.  The personality disorder of course predated the 04-95 work injury, and was not caused by that injury although her personality disorder likely plays a contributing role in Ms. Negaard-Cooley’s maladaptive responses to her injury.

It is my opinion, within a reasonable degree of psychological certainty, that Ms. Negaard-Cooley’s personality disorder would likely have persisted or progressed in the absence of her 04-95 work injury.  It is also my opinion, within a reasonable degree of psychological certainty, that Ms. Negaard-Cooley’s depression would have persisted in the absence of her 04-95 work injury.  I am unable to state within a reasonable degree of psychological certainty whether Ms. Negaard-

Cooley’s somatoform pain disorder would likely have progressed in the absence of her 04-95 work injury.

[¶15] The Bureau forwarded a copy of Dr. Hung’s report to Dr. Garofalo, who responded “[i]t is my opinion that Ms. Negaard did, indeed, suffer with depression prior to her industrial accident.  The industrial accident, however, has worsened said depression.”  Dr. Garofalo would not comment on the ultimate question of the Bureau’s liability for Negaard-Cooley’s treatment, stating he “has chosen to practice clinical psychiatry and to avoid litigation and/or adversarial situations with patients.  This would be quite contra therapeutic and not contributory to the transference relationship.”

[¶16] Negaard-Cooley and Dr. Eick testified at the administrative hearing.  Dr. Eick agreed that Negaard-Cooley’s depression is attributable to her chronic pain syndrome and characterized the chronic pain as the “main factor” causing her depression.  Dr. Eick also testified he did not believe Negaard-Cooley had a personality disorder.

[¶17] The ALJ’s findings are essentially based on parts of Dr. Hung’s report.  The ALJ found Dr. Hung’s credentials “impressive” and his opinions “most persuasive based upon the evidence as a whole.”  The ALJ noted Dr. Garofalo and Dr. Hung disagreed about whether Negaard-Cooley’s depression had been worsened by her work injury, but reasoned “[t]his disagreement is really nothing more than a matter of degree.”  The ALJ also found Dr. Hung to be “far more objective” concerning Negaard-Cooley’s current condition than either Dr. Garofalo or Dr. Eick, and characterized Dr. Eick’s opinion that she did not have a personality disorder “to be near incredible.”

[¶18] It is the Bureau’s responsibility to weigh the credibility of medical evidence, but in resolving conflicts the Bureau must consider the entire record, clarify inconsistencies, and explain its reasons for disregarding medical evidence favorable to the claimant.  
Hibl v. North Dakota Workers Compensation Bureau
, 1998 ND 198, ¶ 10, 586 N.W.2d 167; 
Geck v. North Dakota Workers Compensation Bureau
, 1998 ND 158, ¶ 5, 583 N.W.2d 621; 
Symington v. North Dakota Workers Compensation Bureau
, 545 N.W.2d 806, 808 (N.D. 1996).  In 
Otto v. North Dakota Workers Compensation Bureau
, 533 N.W.2d 703, 706 (N.D. 1995), this Court explained:

“Although the ultimate resolution of conflicting medical testimony falls with the agency, this Court has required the Bureau to clarify discrepancies among inconsistent medical reports. . . .  Initially, we limited the requirement of adequate clarification of discrepancies in medical testimony to situations involving internal conflicts in the attending physician’s report. . . .  Later, we expanded the requirement to include situations involving two reports by the same physician which contained conflicting opinions. . . .  Finally, in 1985, this Court remanded a decision to clarify discrepancies between two different physicians. . . .  Although we are continuing to shape the principles which govern the Bureau’s treatment of inconsistent medical evidence, we must continually bear in mind the basic rule first articulated by Justice Sand: ‘Normally, it is within the province of the administrative agency, not the courts, to weigh conflicting medical opinions and to resolve these conflicts.’. . .”

(Quoting 
Kopp v. North Dakota Workers Compensation Bureau
, 462 N.W.2d 132, 135 (N.D. 1990) (citations omitted)).  
See also
 
Wherry v. North Dakota State Hospital
, 498 N.W.2d 136, 139 (N.D. 1993).

[¶19] Though the Bureau may resolve conflicts between medical opinions, the authority to reject medical evidence selectively does not permit the Bureau to pick and choose in an unreasoned manner.  
Boger v. North Dakota Workers Compensation Bureau
, 1999 ND 192, ¶ 11, 600 N.W.2d 877.  Furthermore, while the Bureau may not make credibility findings in order to “sew up” the claimant’s chances for a successful appeal, those findings will be upheld if they are supported by a preponderance of the evidence.  
Ehli v. North Dakota Workers Compensation Bureau
, 447 N.W.2d 313, 317 (N.D. 1989).

[¶20] We reject Negaard-Cooley’s argument the Bureau failed to adequately explain and clarify the discrepancies between the reports of her treating doctors and the report of Dr. Hung.  The ALJ essentially found Dr. Hung to be a more credible and unbiased witness under the circumstances of this case.  We have declined to establish a presumption entitling a treating doctor’s opinion to “great weight.”  
Siewert
, 2000 ND 33, ¶ 25, 606 N.W.2d 501.  The Bureau did not fail in its duty to adequately explain its reasons for rejecting the opinions of Negaard-Cooley’s treating doctors.

[¶21] The Bureau, however, has failed to clarify glaring discrepancies in Dr. Hung’s IME report.  Dr. Hung indicates in several parts of his report that Negaard-Cooley’s depression is causally related to her work injuries.  After noting Negaard-Cooley’s depression dated back to when she was 18 years old, Dr. Hung states she has had subsequent difficulties with depression “usually associated with . . . work-related physical injuries.”  Dr. Hung suggested Negaard-Cooley’s “self-perception of total vocational disability” plays a role in her depression and contributes to her physical complaints.  Dr. Hung also said it is “likely” Negaard-Cooley’s 1995 “right arm injury and ensuing physical difficulties aggravated” her depression.  Finally, even in his conclusion that there was no significant relationship between Negaard-Cooley’s 1995 work injury and her depression, he specifically uses the phrase, “depression/pain disorder,” thus linking those conditions together.  These parts of Dr. Hung’s report support Negaard-Cooley’s claim that her work injuries and chronic pain were a substantial contributing factor to her clinical depression.  Although the Bureau may reject certain medical evidence because it is not as credible as other medical evidence, if the rejected evidence weighs substantially in favor of the claimant, it is even more necessary for the Bureau to explain discrepancies inherent in the evidence upon which it relies in denying benefits when those discrepancies are consistent with the rejected evidence.  The Bureau simply ignored the parts of Dr. Hung’s IME report which were favorable to Negaard-Cooley and relied on the parts of the report that supported its decision. 

[¶22] Because the Bureau relied on parts of the IME report favorable to its decision and ignored parts of the report unfavorable to its decision, we conclude the Bureau’s decision is not supported by a preponderance of the evidence.  
See, e.g.
, 
McDaniel
, 1997 ND 154, ¶¶ 17-20, 567 N.W.2d 833; 
Claim of Bromley
, 304 N.W.2d 412, 418 (N.D. 1981).

III

[¶23] The judgment is reversed and the case is remanded to the Bureau for further proceedings to clarify the discrepancies in Dr. Hung’s IME report.

[¶24] Gerald W. VandeWalle, C.J.

Dale V. Sandstrom

William A. Neumann

Mary Muehlen Maring

[¶25] The Honorable Carol Ronning Kapsner disqualified herself subsequent to oral argument and did not participate in this decision.